**UNITED STATES**

v.

**Staff Sergeant David S. BRADLEY,
FR227–27–2302, United States
Air Force.**

**ACM 32387.**

U.S. Air Force Court of Criminal Appeals.

Sentence Adjudged 3 Nov. 1995.

Decided 29 Oct. 1997.

716

Before PEARSON, MORGAN, and SPISAK, Appellate Military Judges.

OPINION OF THE COURT

MORGAN, Judge:

Officer and enlisted court members convicted appellant, contrary to his pleas, of rape and indecent assault. The members sentenced him to a dishonorable discharge, 3 years confinement, forfeiture of all pay and allowances, and reduction to E–1. Appellant asserts: 1) that the military judge erred by admitting his pretrial admission; 2) that the military judged improperly restricted appellant's *voir dire* of a female court member and that the peremptory challenge by trial counsel of that member violated his right to due process of law; 3) that his conviction was the result of unlawful command influence and/or improper actions by the staff judge advocate; and 4) that the evidence is factually insufficient to sustain his conviction. Because we are unable to decide the command influence issue based on the current record, we will return the case for a hearing pursuant to *United States v. DuBay*, 37 C.M.R. 411, 1967 WL 4276 (C.M.A.1967). We will reserve the issue of factual sufficiency until we receive the results of the *DuBay* hearing. However, for judicial economy we resolve the issues involving appellant's admission, *voir dire*, and the peremptory challenge in this opinion.

*Denial of Motion to Suppress Appellant's Admission*

We review the military judge's decision to admit appellant's admission under an abuse of discretion standard. *United States v. McLaren*, 38 M.J. 112, 115 (C.M.A. 1993), *cert. denied*, 510 U.S. 1112, 114 S.Ct.

1056, 127 L.Ed.2d 377 (1994). In applying the standard, we defer to the military judge's findings of fact unless they are clearly erroneous. *United States v. French,* 38 M.J. 420, 424–25 (C.M.A.1993), *cert. denied,* 510 U.S. 1112, 114 S.Ct. 1056, 127 L.Ed.2d 377 (1994).

Appellant was questioned by civilian police authorities who suspected him of raping ST, a female airman. Major Scafidi described himself as appellant's "acting commander" at the time. Before speaking with appellant, Major Scafidi met with ST. ST explained to Major Scafidi that she believed appellant had sexual intercourse with her while she was asleep in an intoxicated condition.

Appellant was a cryptologic linguist specialist with a Top Secret security clearance and additional access to special compartmentalized information (SCI). If appellant was arrested or formally charged, Major Scafidi was required to take immediate steps to suspend appellant's clearance and deny him access to classified materials. Major Scafidi spoke with appellant earlier in the day and asked appellant to call him back after he talked to the police. When appellant called back, Major Scafidi asked him what happened. Major Scafidi testified that he was trying to determine appellant's status with the civilian authorities, but was not asking appellant to explain the incident itself.

■ Appellant testified that he knew, based on their prior conversation, that Major Scafidi was asking about his status with the civilian authorities and not about ST's allegations. Based on this testimony, it is clear from the record that both Major Scafidi and appellant understood that, although Major Scafidi was acting in an official capacity, he was seeking information needed for the proper review of appellant's security clearance status and was not conducting a criminal investigation. *Cf. United States v. Loukas,* 29 M.J. 385, 387 (C.M.A.1990) (aircraft crew chief's questioning of a crew member who appeared to be under the influence of drugs was necessary to fulfill operational safety requirements, but was not a law-enforcement or disciplinary investigation which triggered rights warning requirements). Thus, he was not required to advise appellant of his Article 31, UCMJ, 10 U.S.C.A. § 831, rights or his right to counsel.

■ Moreover, for a rights warnings to be required, an incriminating response must be sought or be a reasonable consequence of the questioning. Mil.R.Evid. 305(b)(2) and 305(d)(1). Asking appellant "what happened" might have reasonably been expected to produce an incriminating response under different circumstances. However, appellant knew Major Scafidi was only trying to determine his status with civilian authorities. The mutual understanding of the parties in this instance defeats any assertion that an incriminating response was a reasonably expected consequence. Therefore, no rights warning was required. *See United States v. Meeks,* 41 M.J. 150, 162 (C.M.A.1994).

Appellant denies he told Major Scafidi that he had touched ST without her permission. Whether or not appellant actually admitted this does not alter the analysis. The military judge correctly concluded: "[a]n incriminating response was not requested, and in the mind of the accused, an incriminating response was neither sought nor given. The issue for the members is what weight to give the statement, if any." The military judge did not abuse his discretion in denying appellant's motion to suppress the statement to Major Scafidi.

## *Voir Dire and Peremptory Challenge of Female Court Member*

■ Trial counsel exercised his peremptory challenge against Major Lemon, a female court member. After that challenge, one female court member, Master Sergeant Bloom, remained on the court. Trial defense counsel asserted that trial counsel's peremptory challenge of Major Lemon appeared to be based on her gender and asked that trial counsel be required to state the basis for the challenge. Trial counsel stated that "our basis for striking Major Lemon has absolutely nothing do with her gender. It's related to a prior experience of her serving as an investigating officer on a case involving the 694th Legal Office. It's totally within our discretion based on that." The military judge responded that he was satisfied that a "gender neutral reason had been estab-

lished." Nothing about Major Lemon's prior investigation of the legal office was raised during group *voir dire* of the members or during her individual *voir dire*.

The defense asked permission to conduct additional *voir dire* of Major Lemon. Trial defense counsel wanted to inquire into the accuracy of trial counsel's asserted reasons and, "more importantly," the defense wanted to determine whether the investigation conducted by Major Lemon "would have led her to believe that she could fairly and impartially sit and listen to the evidence in this case." The military judge responded that their concern was "one issue for a challenge for cause versus a peremptory challenge." The judge concluded by stating, "[b]ased on the current state of the law which only requires on its face a neutral reason, I believe it has been satisfied, so your request for additional questioning is denied."

■ We will not reverse a military judge's limitation on *voir dire* unless there has been a clear abuse of discretion which is prejudicial to the appellant. *United States v. Williams*, 44 M.J. 482, 485 (1996); *United States v. Jefferson*, 44 M.J. 312, 317 (1996). The nature and scope of examination of the members is within the discretion of the military judge. R.C.M. 912(d). Appellant contends that, by failing to allow additional *voir dire* of Major Lemon, the military judge prevented the defense from determining whether an investigation of the legal office by Major Lemon had occurred. Without such evidence, appellant claims he could not establish that trial counsel's stated reason for the peremptory challenge was a pretext, and the military judge himself could not properly determine if the reason was a pretext.

Under the facts of this case, the military judge was free to accept the representation of trial counsel, an officer of the court, as factual. The factual basis stated was clearly within trial counsel's personal knowledge, and the judge was not required to allow an inquiry to determine whether the stated reason was true. While that could also have been quickly accomplished in appellant's case by questioning Major Lemon, in many instances checking the accuracy of a counsel's stated reason for a peremptory challenge could be time consuming or even result in a mini-trial on that issue.

Once a facially gender neutral reason that was not apparently pretextual was stated, the military judge was not required to allow further inquiry. Additionally, the defense counsel stated that the most important reason for requesting additional *voir dire* was to determine whether the member could, in fact, be impartial. The military judge correctly noted that defense counsel was confusing the issues involved in a challenge for cause with those involved in a peremptory challenge. We find that the military judge did not clearly abuse his discretion in appellant's case by denying additional *voir dire* of this member.

Appellant further contends that trial counsel's challenge of Major Lemon violated appellant's right to due process of law. The United States Supreme Court has held that it is improper to challenge any member of a jury on the basis of gender. In doing so, the Supreme Court focused on the Fourteenth Amendment equal protection right of jurors, as well as litigants, to jury selection procedures which are free of gender or other improper discrimination. *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 128, 114 S.Ct. 1419, 1421, 128 L.Ed.2d 89 (1994). The Supreme Court stated that, as with race-based discrimination claims under *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the party alleging gender discrimination must make a *prima facie* showing of intentional discrimination before the party exercising the peremptory challenge is required to explain the reason for the challenge. The Supreme Court emphasized that the explanation "need not rise to the level of a 'for cause' challenge; rather, it must merely be based on a juror characteristic other than gender, and the proffered explanation may not be pretextual." *Id.*

Following the Supreme Court's guidance in *J.E.B.*, we have held that "[a] military accused has an equal protection right, based on the due process requirement of the Fifth Amendment, to be tried by a court from which no gender has been improperly excluded." *United States v. Ruiz*, 46 M.J. 503, 508 (A.F.Ct.Crim.App.1997). Like the Supreme

Court, we held that the objecting party must establish a *prima facie* showing of intentional discrimination before the party exercising the challenge is required to explain the basis for it. *Id.* We declined to adopt a *per se* rule requiring a party to explain their decision whenever there was an objection to a peremptory challenge based on the gender of the member, leaving that decision to the sound discretion of the trial judge. *Id.* We stated that:

> There must be some reason to suspect gender discrimination based upon the context of the case, the constituency of the court, or the identity of the parties, victim, or witnesses. When an explanation is required, it need not rise to the level of a challenge for cause. The explanation must be based on a juror characteristic other then gender, and may not be pretextual.

*Id.* We recognized the practical reality that each party in a court-martial is entitled to only one peremptory challenge and the fact that female representation on court-martial panels is often small in number or not present based on the much larger percentage of men serving in the military and available for court duty.

Since our decision in *Ruiz*, the Court of Appeals for the Armed Forces has held "that gender, like race, is an impermissible basis for the exercise of a peremptory challenge by either the prosecution or the military accused." *United States v. Witham*, 47 M.J. 297 (1997).

▮ In appellant's case, trial counsel challenged one of two female court members (the only female officer) in the case of a male accused and a female victim. Trial defense counsel failed to make even a *prima facie* showing of gender discrimination. In any event, when the military judge required the trial counsel to state a gender neutral reason, she gave one. The assertion that member had conducted a prior investigation of the base legal office certainly was gender neutral, did not appear to be pretextual, and would be a reasonable basis for trial counsel to feel uncomfortable with that member sitting on the court. We find that trial counsel properly exercised the government's right to a peremptory challenge under the facts of

this case and, therefore, this challenge did not deny appellant his right to due process of law. Trial counsel's proffered reason for the challenge was not unreasonable, implausible, or one that otherwise made no sense. *United States v. Tulloch*, 47 M.J. 283 (1997). We do not read *Tulloch* as elevating a peremptory challenge to the level of a cause challenge. A nonpretextual gender-neutral reason was all trial counsel was required to provide.

### Unlawful Command Influence

▮ We review the issue of command influence *de novo*. *United States v. Wallace*, 39 M.J. 284 (C.M.A.1994). Appellant has the initial burden of producing sufficient evidence of unlawful command influence. *United States v. Newbold*, 45 M.J. 109, 111 (1996); *United States v. Ayala*, 43 M.J. 296, 299 (1995); *United States v. Stombaugh*, 40 M.J. 208, 213 (C.M.A.1994). Appellant must

(1) "allege[ ] sufficient facts which, if true, constitute unlawful command influence;" (2) show that the proceedings were unfair; and (3) show that the unlawful command influence was the proximate cause of that unfairness ... The same three-pronged analysis would apply to an allegation of unlawful interference with access to witnesses.

*Newbold*, 45 M.J. at 111; *Stombaugh*, 40 M.J. at 213. Once appellant has met his burden of production, the burden then shifts to the government to either prove that command influence did not occur or, if it did, to establish beyond a reasonable doubt that the findings and sentence have not been affected by unlawful command influence. *United States v. Gerlich*, 45 M.J. 309, 310 (1996); *Ayala*, 43 M.J. at 299; *Stombaugh*, 40 M.J. at 213–14.

Appellant complains of numerous acts by the general court-martial convening authority's staff judge advocate (SJA) and the special court-martial convening authority's SJA that he claims were improper and amount to unlawful command influence. Although appellant attempts to argue that the acts of the two SJAs should be considered together, we note that the general court-martial convening authority was the Commander, Air Force

Intelligence Agency, located at Kelly Air Force Base, Texas, while the special court-martial convening authority was the Commander, 694th Intelligence Group, located at Fort Meade, Maryland. Finding nothing that indicates the two SJAs were acting in concert and nothing to indicate the subordinate command SJA did, could, or even attempted to influence the general court-martial SJA, we will review the acts of the SJAs separately.

Appellant contends that the acting SJA for the general court-martial convening authority, Major Terrie Gent, exercised improper command influence in the following manner: 1) she advised the convening authority to refer the rape charge and first specification of indecent assault to trial, even though the Article 32, UCMJ, 10 U.S.C.A. § 832, investigating officer had recommended "dropping" those charges based on insufficient evidence; 2) she improperly invoked the opinion of a non-lawyer commander, Colonel Eugene F. Beauvais, that he found the evidence supported the charges and that he recommended the charges be referred to trial by a general court-martial; and 3) she seemingly advised the convening authority to screen out prospective court members who might be inclined to see the case against appellant in the same light as the investigating officer. Appellant further contends that the convening authority himself, by following the advice of Major Gent, rather than the recommendations of the Article 32 investigating officer, was somehow exercising improper command influence.

■ As acting SJA, Major Gent was merely complying with her statutory responsibility when she provided her pretrial advice to the convening authority. Article 34, UCMJ, 10 U.S.C.A. § 834; R.C.M. 406. She was free to differ with the recommendation of the officer who conducted the pretrial investigation. The facts of this case indicate that her difference of opinion was a reasonable one. In fact, the members found appellant guilty of both the rape and indecent assault specifications that she recommended go to trial.

■ Appellant's claim that Major Gent improperly invoked the opinion of Colonel

Beauvais, Commander of the 694th Intelligence Group, is without merit. Colonel Beauvais was required to make a recommendation when he forwarded the charges. Air Force Instruction 51–201, Administration of Military Justice, para. 4.1.4. (28 July 1994); R.C.M. 401(c)(2)(A), 404(c). Major Gent was merely repeating, to properly inform the convening authority, what that commander had recommended when he forwarded the charges. It is commonly understood that convening authorities can, should, and do consider the required recommendations of subordinate commanders in determining the disposition of charges. R.C.M. 406(b), Discussion.

■ We can find nothing in the record to support appellant's claim that Major Gent somehow suggested in her pretrial advice that the convening authority select members favorable to the government. She merely recommended to the convening authority that he select 10 members from a list of proposed members submitted to him along with the background information on each potential member. This has long been recognized as a proper practice. *United States v. Kemp*, 46 C.M.R. 152, 1973 WL 14469 (C.M.A.1973). During oral argument, appellant's counsel could provide no further insight into what evidence he suggested supported this claim. We can find absolutely none.

■ Appellant's claim that the convening authority engaged in improper command influence by following Major Gent's advice, instead of the recommendation of the Article 32 investigating officer, or that he somehow accepted some unspecified guidance to unfairly stack the court-martial, are totally without merit.

In summary, all complained of acts performed by Major Gent, as acting SJA of the Air Intelligence Agency, were proper and expected actions in the pre-referral process. Nothing she did suggests even the slightest hint of command influence or any form of improper action or motive. We find appellant has failed to provide any evidence which raises the specter of unlawful command influ-

ence on the part of Major Gent or the general court-martial convening authority.

We next turn to the actions of Lieutenant Colonel (Lt Col) Joseph F. Dent, the special court-martial convening authority's SJA. Appellant contends that Lt Col Dent's actions were improper as follows: 1) he pressured a defense witness not to testify on appellant's behalf; 2) he engaged in a discussion with the president of the court-martial during a break in the trial; and 3) he failed to allow a verbatim transcription of the Article 32, UCMJ, pretrial investigation testimony of ST, the victim.

On March 15, 1996, over four months after the November 3, 1995, conclusion of appellant's trial, Master Sergeant (MSgt) Lisa M. Becker submitted an affidavit detailing her contact with Lt Col Dent. This affidavit was submitted to the convening authority as part of appellant's extensive clemency package. MSgt Becker states that, on October 30, 1995, the first day of appellant's trial, she called the 694th Intelligence Group legal office to find out when she was to be called as a defense witness and where the trial was being held.

The person answering the phone identified himself as Lt Col Dent, but she had no idea who he was or what his job was. She explained that she was probably going to be called as a defense witness and needed to know where to go and when she needed to be there. She states that Lt Col Dent asked her what she was going to say. She told him about her visit with the victim at the hospital on the night of the offenses in her capacity as acting first sergeant. She then offered her opinion as to appellant's innocence and the victim's reputation for dishonesty and promiscuity.

She states that Lt Col Dent then told her that, under the law, she could not mention anything about the victim's promiscuity and proceeded to fill her in on the government's case against appellant. She says he told her that appellant had given several versions of what happened, that appellant had "confessed" to Major Scafidi, that appellant was not willing to take a polygraph, and that she didn't have all the facts. Based on her conversation with Lt Col Dent, MSgt Becker felt it was clear that Lt Col Dent believed appellant was guilty.

Because of what he told her during their phone conversation, she began to have doubts about her belief that appellant was innocent. She began to worry that she might be about to help a guilty man go free. However, after discussing the matter with her husband and giving it careful consideration, she still believed appellant was innocent based on his outstanding reputation for honesty and integrity and the victim's reputation for being deceitful in her personal relationships with men. She was also concerned that she might have made an error, because she had spoken to someone from the prosecution.

MSgt Becker states that it was not until after the trial was over and she saw an article in the November 1995 issue of "The Eagle," a 694th Intelligence Group publication, that she learned that Lt Col Dent was the local SJA. She was disturbed by the fact that this article, published less than two weeks after appellant's trial, drew comparisons to the infamous "Tailhook" incident and that the article said appellant's case was "a perfect example of how the military will hold accountable any member who takes sexual advantage of another member." She thought this article indicated a lack of neutrality on the part of Lt Col Dent. Such post–trial articles have caused similar concern to our superior Court. However, since this article was published at Fort Meade, Maryland, by the local legal office, we find nothing about it which would affect the impartiality of the general court-martial convening authority or his SJA, both located at Kelly Air Force Base, Texas. *See United States v. Wansley,* 46 M.J. 335 (1997).

In spite of all that occurred, MSgt Becker did testify for the defense during its case in chief. She testified that she knew appellant both professionally and socially and that she believed he was a very honest person. She had observed him around other women when he had consumed alcohol and said he had always behaved himself. She also provided two affidavits and a character statement on appellant's behalf in clemency.

Appellant further asserts that a discussion between Lt Col Dent and the president of the court-martial constituted unlawful command influence. Such a conversation did occur and was brought to the court's attention by counsel for both sides. The military judge asked the court president if his discussion with the SJA had concerned appellant's court-martial. The member responded "[n]one whatsoever." He explained that he had been contacted by his first sergeant about a pending disciplinary matter in his unit and had approached Lt Col Dent to discuss that matter. The military judge advised the member that if there was a need to speak to one of the attorneys in the legal office, it should be brought to the attention of the court to avoid any perception of impropriety. Both parties declined the military judge's offer to conduct *voir dire* of the member, and neither party objected to the member continuing to sit on the court.

Finally, appellant argues that the convening authority's failure, through the actions of Lt Col Dent, to allow a verbatim transcription of the victim's testimony at the pretrial investigation constituted unlawful command influence. Although not specified in his appeal, we assume appellant is referring to the special court-martial convening authority who ordered the Article 32, UCMJ, pretrial investigation. The defense had offered to provide a certified court reporter and pay for the costs of the transcript if the government denied the request based on cost or reporter availability. The defense stated that lack of a verbatim transcript of the victim's testimony would severely hamper their ability to properly defend appellant and would deny appellant his constitutional right to effective assistance of counsel in the cross examination of the victim.

Lt Col Dent (then Major Dent) denied appellant's request on June 2, 1995. As the SJA for the special court-martial convening authority, he had authority to make that decision. Air Force Instruction 51–201, Administration of Military Justice, para 4.1.2. (28 July 1994). On its face, his denial was a proper exercise of that authority. However, after discussing appellant's request and explaining the reasons for his denial, he added the following in paragraph 5 of his denial letter to trial defense counsel:

> Your final concern in paragraph 3 was that without a verbatim transcription, the accused would be denied "effective assistance of counsel" in cross examination of the alleged victim. You fail to show how the absence of a verbatim Article 32 transcript will, by itself, render you or your civilian co-counsel ineffective. **Unfortunately, the competency of any military or civilian defense counsel is largely beyond the control of this office. Should you have further concerns about your competency, however, I urge you to notify your Chief Circuit Defense Counsel.** (Emphasis added.)

We cannot help but wonder what Lt Col Dent had in mind when he wrote the above emphasized words. It might well indicate that he had, in fact, lost his objectivity in this case or, alternatively, that he was irritated with the defense for insisting on a verbatim transcript. In any event, when we combine Lt Col Dent's comments with the article condemning appellant's conduct in the base newspaper, only two weeks after the trial and long before final action in the case, and appellant's unrebutted claim that Lt Col Dent improperly tried to persuade MSgt Becker not to testify, we have grave concerns over whether appellant received a trial free from the atmosphere of improper command influence.

In this regard, the government did not offer an affidavit from Lt Col Dent or any other evidence to contradict MSgt Becker's version of the conversation they had. We are therefore left to accept MSgt Becker's version on its face value. Based on what she stated, we are not convinced from the record that Lt Col Dent did not attempt to improperly influence a defense witness during the trial of the case. *United States v. Ginn,* 47 M.J. 236 (1997); *United States v. Bartley,* 47 M.J. 182 (1997). Since this matter was not brought up during the trial, we do not know how Lt Col Dent's conversation with MSgt Becker may have actually impacted her testimony, but we do know from her affidavit that it did not have a positive effect.

The fact that she eventually testified favorably for the defense is not sufficient to remove the possibility that Lt Col Dent improperly influenced her testimony. We have no way of knowing what her testimony might have been absent the conversation or how any doubts created by the conversation may have affected her demeanor as a witness. Even if what he told her about testifying concerning the victim's promiscuity was a generally accurate representation of the law, **it was clearly not his place to be so advising a defense witness.** It may have dissuaded her from bringing up the matter with appellant's trial defense team who may have tried to seek its admission, if relevant and otherwise admissible. *See e.g., United States v. Colon–Angueira,* 16 M.J. 20 (C.M.A.1983). That question was for the military judge to decide, not Lt Col Dent.

As the record of trial now stands, there is a perception of an unfair atmosphere hanging over the case because of the totality of Lt Col Dent's actions. However, we will provide Lt Col Dent the chance to tell his side of the story before we reach any conclusion concerning unlawful command influence. Our superior Court has expressed concern about SJAs remaining impartial during the court-martial process. *Wansley,* 46 M.J. at 337. It is not clear from the record that such was the case at the base level in appellant's case. Even though we will not impute any of Lt Col Dent's potentially improper actions to the office of the general court-martial level SJA or to the general court-martial convening authority, his actions alone could amount to unlawful command influence that the government has not adequately rebutted. Without further evidence, we can not be convinced beyond a reasonable doubt that unlawful command influence did not affect the outcome of appellant's case. *Stombaugh,* 40 M.J. at 214.

Because the issue of unlawful command influence was not raised at trial, the facts necessary for us to resolve appellant's claims are not adequately developed. Therefore, we order that the record of trial be returned to The Judge Advocate General for referral to an appropriate convening authority for a hearing in accordance with *United States v. DuBay,* 37 C.M.R. 411, 1967 WL 4276 (C.M.A.1967). The military judge will hear testimony, receive evidence, and enter findings of fact and conclusions of law on the issue of possible unlawful command influence by Lt Col Dent. At a minimum, Lt Col Dent and MSgt Becker must appear as witnesses. The military judge or the parties may call other witnesses or submit such other evidence as is relevant to this issue. We direct that the government make all reasonable efforts to obtain and produce at the hearing a copy of the Fort Meade publication, the "The Eagle," which was published by the 694th Intelligence Group a few weeks after appellant's trial ended and contained an article by the legal office discussing the results of appellant's trial. The military judge should, at a minimum, inquire into the areas set out in the appendix to our opinion.

The military judge shall enter findings of fact addressing any conversation between Lt Col Dent and MSgt Becker and whether any such conversation affected either MSgt Becker's trial testimony, her demeanor as a witness, or what information she provided to appellant's defense counsel. He shall also make findings of fact on the contents of the post-trial article in "The Eagle" which discussed the results of appellant's case. He shall make conclusions of law as to 1) whether any acts of Lt Col Dent amounted to unlawful command influence or an improper attempt to influence a witness; 2) if so, did Lt Col Dent's acts cause appellant's trial to be unfair; and 3) if so, did the government establish beyond a reasonable doubt that the findings and sentence of appellant's trial were not affected by unlawful command influence or an improper attempt to influence a witness. *See Stombaugh,* 40 M.J. at 213–14.

Within 90 days from the date of this opinion, the convening authority will return the record, with the military judge's findings of fact and conclusions of law, to the Court for further review. Requests for extension of time will be addressed to this Court through appellate government counsel.

Senior Judge PEARSON and Judge SPISAK concur.

**Questions for Lt Col Dent:**

1) Did Lt Col Dent have a conversation with MSgt Becker during or shortly before appellant's trial?

2) If so, what was the purpose of having the conversation with Master Becker and what did he tell her or discuss with her during the conversation?

3) Did he intend to discourage or otherwise influence her testimony at appellant's trial?

4) If he discussed the facts of appellants case with her, why did he do so and how did the subject come up?

5) Did he specifically advise her that she could not testify on certain matters such as the victim's reputation for either promiscuity or honesty?

6) If so, had she asked for his opinion or did he volunteer it?

7) Did he tell her that appellant had given several different versions about what had happened?

8) Did he tell her that appellant had "confessed" to Major Scafidi?

9) Did he tell her that appellant had refused to take a polygraph?

10) Did he tell her that she did not have all the facts?

11) Is Lt Col Dent familiar with an article written about appellant's case in "The Eagle" shortly after appellant was convicted?

12) Did his legal office prepare this article?

13) What part, if any, did he personally have in writing the article?

14) Did the article liken appellant's case to the "Tailhook" incident?

15) Did the article state that appellant's case was an example of how the Air Force would hold accountable any member who took sexual advantage of another member?

16) What was the purpose of comments in Lt Col Dent's last sentence of paragraph 5 of his letter denying appellant's request for a verbatim transcription of the victim's Article 32, UCMJ, pretrial investigation testimony?

**Questions for MSgt Becker:**

1) When exactly did she have her telephone conversation with Lt Col Dent?

2) What was her purpose in calling the legal office?

3) When Lt Col Dent answered the phone and identified himself by name, to whom did she think she was speaking in terms of his position?

4) Did she believe he was the SJA?

5) Did she believe he was one of the attorneys in the office?

6) Did she believe he was connected with the prosecution?

7) What did she tell Lt Col Dent during her conversation with him?

8) Did she discuss her possible testimony at appellant's trial?

9) If so, did she volunteer this information or did he ask?

10) What did she say about her possible testimony?

11) What did Lt Col Dent say to her about her testimony?

12) Did she ask his opinion or did he volunteer it?

13) Did he indicate to her that any part of her testimony might be inadmissible at trial?

14) If so, what portions?

15) What did Lt Col Dent tell her about appellant's case or the evidence against appellant?

16) Was the information volunteered by Lt Col Dent, or did she ask?

17) Did this conversation cause her to hesitate to testify?

18) Since she eventually did testify on appellant's behalf, did anything Lt Col Dent said to her affect her testimony on behalf of appellant and, if so, how (in detail)?

19) Did she modify or withhold any portion of her testimony based on her conversation with Lt Col Dent and if so what (in detail)?

20) Did her conversation with Lt Col Dent affect her demeanor or enthusiasm as a witness for appellant?

21) Did she fail to bring any matter to the attention of appellant's defense counsel because of her conversation with Lt Col Dent that she would have brought up before the conversation?

22) Had she told appellant's defense counsel about her opinion as to the victim's reputation for promiscuity or her reputation of dishonestly in her personal relations with men before her conversation with Lt Col Dent?

23) Did she discuss these two subjects with appellant's defense counsel after her conversation with Lt Col Dent?

24) Did she inform trial defense counsel of the conversation and if not, why?

25) When did she learn that Lt Col Dent was the local base SJA?

26) When did she read the article in "The Eagle" which discussed appellant's trial?

27) What does she remember about that article?

The parties and the military judge are free to ask additional relevant questions of these witnesses and to call other relevant witnesses or introduce other relevant evidence on the issues before the military judge during this *DuBay* hearing.