UNITED STATES, Appellee,

v.

David S. BRADLEY, Staff Sergeant,
U.S. Air Force, Appellant.

No. 98–1113.
Crim.App. No. 32387.

U.S. Court of Appeals for
the Armed Forces.

Argued June 1, 1999.

Decided Sept. 17, 1999.

SULLIVAN, J., delivered the opinion of the Court, in which COX, C.J., and CRAWFORD, GIERKE, and EFFRON, JJ., joined.

For Appellant: *William M. Ferris* (argued); *Colonel Douglas H. Kohrt* and *Captain Stephen P. Kelly* (on brief).

For Appellee: *Major Kenneth A. Arnold* (argued); *Colonel Anthony P. Dattilo, Major Ronald A. Rodgers,* and *Captain Martin J. Hindel* (on brief).

Judge SULLIVAN delivered the opinion of the Court.

During October and November of 1995, appellant was tried by a general court-martial composed of officer and enlisted members at Fort George G. Meade, Maryland. Contrary to his pleas, he was found guilty of one specification of rape, and two specifications of indecent assault, under Articles 120 and 134, Uniform Code of Military Justice, 10

USC §§ 920 and 934, respectively. The members sentenced him to a dishonorable discharge, 3 years' confinement, total forfeitures, and reduction to E–1. The convening authority approved the sentence as adjudged on August 26, 1996. On appeal, the Court of Criminal Appeals ordered a *DuBay*[1] hearing on the issue of unlawful command influence. 47 MJ 715 (1997). After that hearing was conducted in March 1998, the lower court affirmed the findings and sentence on June 30, 1998. 48 MJ 777.

On February 22, 1999, this Court granted review on the following issues:

I

WHETHER THE MILITARY JUDGE ABUSED HIS DISCRETION AND/OR WAS CLEARLY ERRONEOUS IN DENYING APPELLANT'S PRE–TRIAL MOTION TO SUPPRESS AN ALLEGED ADMISSION OBTAINED IN VIOLATION OF ARTICLE 31 OF THE UNIFORM CODE OF MILITARY JUSTICE (UCMJ)[2].

II

WHETHER APPELLANT'S CONVICTION AND/OR SENTENCE IN THIS CASE WAS THE RESULT OF THE IMPROPER EXERCISE OF COMMAND INFLUENCE AND/OR IMPROPER ACTIONS BY THE SPECIAL COURT–MARTIAL CONVENING AUTHORITY'S STAFF JUDGE ADVOCATE.

We resolve these issues in the Government's favor.

I

On Issue I, the record before us shows that appellant was a "cryptologic linguist specialist" with a high-level top secret security clearance. On August 5, 1994, he was accused of raping and indecently assaulting a female member of his unit. The Government produced evidence that appellant's acting commander, Major Scafidi, received a phone

---

**1.** *United States v. DuBay,* 17 USCMA 147, 37 CMR 411 (1967).

**2.** 10 USC § 831.

call informing him of the alleged rape. He then attempted to contact appellant by telephone. Once contact was made, Major Scafidi informed appellant that he needed to speak with him after appellant spoke with police.

The next day, appellant called Major Scafidi as instructed. Major Scafidi testified to the telephone conversation as follows:

Q. [TC]: Okay. When he called you back, as best you can remember, after you answered the phone, what did the accused say to you or what did you say to him?

A. I asked him *what happened at the police station.*

Q. Word for word as best you can recall, what exactly did you say?

A. I said—

Q. First of all, did you ask him where he was?

A. I asked, "Where are you at?"

Q. And what did he say?

A. He said, "I'm at home," and I said, "What happened?"

Q. And when you asked what happened, what were you asking?

A. *I needed to know what happened at the police station.*

Q. Is it fair to say that just because he's home something *might* have happened at the police station?

A. Yes.

Q. He might have been booked and released, for example?

A. That's correct.

Q. And you needed to know that?

A. That's correct.

Q. When you said, "What happened?", what did the accused say?

A. *He said, "I admitted to touching her without her consent."*

Q. And your understanding is that he was relating to you what he had just said at the police station that afternoon.

A. Yes.

(Emphasis added.)

Major Scafidi testified that the purpose of his call was to inquire whether appellant had been arrested, charged, or accused of criminal conduct in order to determine whether appellant's security clearance required termination. He did not ask any other questions.

Appellant testified somewhat differently. He testified that he spoke with Major Scafidi twice after his arrest by civilian authorities. The record states:

Q[DC]. What was you conversation with Major Scafidi?

A. He asked me, *"What's going on?"* He said that—he asked me if I had spoke with the authorities yet, and I said no, that I was going to soon. He then told me he couldn't tell me any more; he couldn't talk to me about what was going on; that as soon as I was done speaking with the authorities to call him back. Detective Wright came to my house.

Q. Before you go on, did he ask you any questions—he Major Scafidi—did he ask you questions regarding when was your next scheduled duty time?

A. At that time, no, he did not.

Q. Did he ask you what your status was or had you been charged with an offense?

A. At that time I told him that I had not talked to the authorities yet and that I had not been contacted or charged or seen by anybody of the authorities.

Q. Did he express to you at that time any conversations regarding, "If you are charged or if anything happens, please call me because it pertains to your security clearance"? Did he make any statements regarding that?

A. Not relating to the security clearance. *His concern was simply had I spoke with the authorities, had I been charged. No reference to the security clearance at that time.*

Q. That was your first conversation with the major?

A. Yes, sir, it was.

Q. Did you later call him back?

A. Yes, sir. After Detective Wright left my home, I returned Major Scafidi's call. *He asked me what was going on, and I said that I hadn't been charged and related to him what Detective Wright said to me which was, "Assuming you touched her without permission, this is aggravated as-*

sault, but I'm not charging you with that now," *and I related that information quoting Detective Wright to Major Scafidi.*

Q. Did you tell Major Scafidi this is what the detective told you or did you say, "Sir, this is what happened; this is what I did; or this is what I heard"?

A. I said, "This is what Detective Wright indicated to me what is going on with my status—with my current status."

Q. Did the major then ask you if you had gone down to the police station for any questioning or to be arrested and formally charged?

A. No, he did not.

Q. Did he ask when your next duty day was?

A. Yes, he did. He asked me, "When do you have to work again?" I replied, "Early Monday morning; I have a mission scheduled for probably 2:00 or 3 o'clock show time early Monday morning." He said, "Okay. Do not go to the mission; report to the commander at 7:30."

Q. Did he give you any instructions as far as finding a replacement or someone to fly in your place?

A. He said he would take care of that. He said that he would find out who the NCOIC in charge of the mission that morning was and take care of having a replacement for me, that my concern was to be in blues Monday morning at 7:30 to see Colonel Mitzel.

Q. Was there anything else in that conversation with the major?

A. *No, sir, just he asked me, "Have you been charged? Have you been detained?" "No." And "Don't go to the mission on Monday morning."*

Q. At any point during any of your conversations, either your first phone call to the major or the later one, did he ever read you your Article 31 rights?

A. No, sir, he did not.

Q. Did he ever tell you, if not formally your Article 31 rights, did he ever say anything about, "There's some serious charges or there's been an allegation"?

A. No, he did not.

Q. Did he ever say, "Don't make any statements to me about what happened. I'm just trying to determine what your duty status is as relating to your clearance"?

A. No, sir, he did not. He did the opposite. He told me he could not speak to me but never advised me to not tell him the information.

* * *

Q[TC]: —when you called him back, he asked you what happened? He was asking you what had just happened that afternoon wasn't he?

A. He asked me my status. *The "what happened" he was asking me the status of the nature of [sic] with the authorities being there I understood him asking me, "Have you been charged? Are you going to be detained? What's your situation?" I understood that to be the question.*

(Emphasis added.)

At trial, appellant moved to suppress evidence of the *unwarned statement* made to Major Scafidi because he was conducting a disciplinary inquiry and failed to read him his Article 31 rights. The military judge denied the motion and made factual findings stating that there was "no question that both the questioner and the person questioned understood the purpose and intent of the question, 'What happened?' An incriminating response was not requested, and in the mind of the accused, an incriminating response was neither sought nor given."

The Court of Criminal Appeals affirmed appellant's conviction because it held that the "military judge did not abuse his discretion" by admitting appellant's pretrial statement to his acting commander. The lower appellate court found, as the military judge found, that Major Scafidi "was not conducting a criminal investigation." 47 MJ at 717.

— — —

Appellant asserts that the military judge erred in denying his motion to suppress evidence of his purported pretrial admissions to his acting commander, Major Scafidi. He

first contends that the judge erred in finding his commander was not acting in a disciplinary capacity when that commander telephoned him and asked, "what happened." He next argues that the service appellate court erred when it held that no Article 31 violation occurred simply because he took the witness stand and disputed the accuracy of the responses which Major Scafidi testified he made to these questions. We disagree with both arguments.

Turning first to appellant's "troubling paradox" argument, Final Brief at 29, we conclude that he has misread the opinion of the service court below. Neither the military judge nor the Court of Criminal Appeals held that appellant's testimony disputing Major Scafidi's testimony on appellant's responses to the challenged questioning waived or forfeited his suppression motion. They did conclude that appellant's testimony that he provided non-incriminating answers to those questions and he perceived these questions as non-incriminating was some evidence that this was not interrogation barred by Article 31. This was not legal error. *United States v. White,* 48 MJ 251, 257–58 (1998) (considering appellant's perception of events to determine whether interrogation occurred); *see United States v. Meeks,* 41 MJ 150, 162 (CMA 1994).

■ Turning to appellant's first argument, this Court's precedents hold that warnings under Article 31 are required when a suspect or an accused is questioned by a military superior during an official law enforcement investigation or disciplinary inquiry. *See United States v. McLaren,* 38 MJ 112 (CMA 1993), *cert. denied,* 510 U.S. 1112, 114 S.Ct. 1056, 127 L.Ed.2d 377 (1994); *United States v. Loukas,* 29 MJ 385 (CMA 1990); *see also United States v. Moore,* 32 MJ 56, 60 (CMA 1991). Indeed, this Court will presume "that a superior in the immediate chain of command" is acting in an investigatory or disciplinary role unless circumstances show otherwise. *Loukas, supra* at 389 n. *; *United States v. Good,* 32 MJ 105, 108 (CMA 1991); *United States v. Pittman,* 36 MJ 404, 407 n. 7 (CMA 1993). Here, the military judge found that appellant's com-

mander was not acting in a law enforcement or disciplinary role when he questioned appellant.

■ This Court previously considered the type of circumstances surrounding a commander's official questioning of an accused which did not necessitate Article 31 rights' warnings. In *Loukas,* the accused indicated that he "was experiencing a hallucination" aboard an aircraft in mid flight. In response to his irrational behavior and without administering Article 31 warnings, the crew chief asked the accused, his subordinate, "if he had taken any drugs." We held that admission of the accused's response (he had taken some cocaine the night before) did not violate Article 31 because the challenged questions were pertinent to the crew chief's "operational responsibilities" for the safety of the plane and its crew. We further noted "there was no evidence" that the superior's questions "were designed to evade the accused's constitutional or codal rights." 29 MJ at 386, 389; *Good, supra* at 109.

Appellant does not generally contend that a security clearance question is not within the ambit of the administrative and operational exception to Article 31, as recognized by our case law. His particular complaint is that his commander used his security responsibilities as a pretext to ask appellant questions which would be both incriminating and admissible in court. Both the military judge and the Court of Criminal Appeals factually rejected appellant's view of the evidence on this point. We conclude that their findings of fact were not clearly erroneous and were amply supported by the evidence of record in this case. *See generally United States v. Campos,* 42 MJ 253, 261 (1995).

In this regard, we note, Major Scafidi testified that the purpose of his questions was to determine whether charges were filed because that action would necessitate suspension of appellant's high level security clearance. He also testified that he did not seek or ask for incriminating information about the alleged rape. *See also United States v. Hessler,* 7 MJ 9 (CMA 1979). Furthermore, there was no other evidence in this case which shows that Major Scafidi was pursuing

a criminal investigation or held any other law enforcement role in appellant's case. On the contrary, evidence was admitted that immediately after asking appellant "what happened?", he pulled appellant's TS/SCI clearance and told him not to report to duty, thus corroborating his testimony. *See Loukas, supra* at 389. Appellant also presented no evidence that Major Scafidi asked the question as a ruse for an investigation or attempted to evade appellant's Article 31 rights. *Id.* at 388. Finally, as noted by the court below, "it is clear from the record that both Major Scafidi and appellant understood that, although Major Scafidi was acting in an official capacity, he was seeking information needed for the proper review of appellant's security clearance status and was not conducting a criminal investigation." 47 MJ at 717. Accordingly, we conclude that the military judge did not err in admitting appellant's pretrial statements to Major Scafidi. *See United States v. Campos, supra.*

## II

In the second granted issue, appellant alleges that Lieutenant Colonel (Lt Col) Dent, the special court-martial convening authority's staff judge advocate (SJA) improperly influenced his general court-martial in four specific ways. First, he contends that the SJA improperly pressured a defense witness, Master Sergeant (MSgt) Lisa Becker, not to testify. Second, he asserts that this SJA engaged in improper ex parte communications with the president of the panel. Third, he alleges that this same officer published an article in the base newspaper which prejudiced appellant's chances for clemency from the general court-martial convening authority. Finally, he avers that the SJA (Lt Col Dent) after trial dissuaded a court member from providing a letter for appellant's clemency package.

### (1) Pressure on defense witness

Appellant's first contention, as noted above, is that MSgt Becker was unlawfully influenced by Lt Col Dent, the staff judge advocate to the special court-martial convening authority at Fort Meade, Maryland. He asserts that the SJA spoke with MSgt Beck-

er on the telephone and dissuaded her from testifying for the defense in this case. He contends that the SJA's comments were "blatantly improper" and caused this witness' testimony to be "less enthusiastic and less forthcoming" for the defense. Final Brief at 34–35.

▮▮▮ Our initial concern is whether the SJA's telephone conversation amounted to unlawful command influence. *See* Art. 37(a), UCMJ, 10 USC § 837(a). Certainly, an SJA may not engage in conduct which dissuades defense witnesses from testifying truthfully at courts-martial. *See United States v. Gleason*, 43 MJ 69, 73 (1995). Here, however, the Court of Criminal Appeals found the same facts as those found by the judge at the *DuBay* hearing and concluded that they "neither indicated bias towards appellant nor amounted to unlawful command influence." 48 MJ at 779. We need not decide this question because we agree with the appellate court below that no prejudice in this case occurred as a result of the SJA's conduct.

That court stated:

Although MSgt Becker's testimony conflicted in part with Lt Col Dent's, she admitted that although she did think about not testifying after their conversation, she nonetheless decided to testify for the appellant both on the merits and during sentencing. We note from the record that, in addition to testifying about the victim's demeanor at the hospital, she also provided strong character and truthfulness testimony on behalf of appellant. However, at the post-trial hearing she had apparently forgotten giving this latter testimony and claimed to have withheld it because of her conversation with Lt Col Dent.

48 MJ at 779–80 (1998). Appellant has proffered no legal authority that a loss of enthusiasm constitutes legal prejudice requiring reversal and he has not indicated what, if any, testimony was withheld by this witness. In these circumstances appellate relief is not warranted. *See generally United States v. Rivers*, 49 MJ 434, 443 (1998) (this Court "satisfied that appellant was not deprived of any witnesses").

### (2) Ex parte communication

■ Appellant next contends that Lt Col Dent engaged in improper ex parte communications with the president of appellant's court-martial panel. He asserts that the service appellate court erroneously found only one such conversation occurred, when in fact another occurred as well, and two such conversations are enough for reversal. We disagree.

It is not the number of ex parte conversations which is critical, but their content. *See United States v. Hamilton,* 41 MJ 22, 27 (CMA 1994), *cert. denied,* 513 U.S. 1084, 115 S.Ct. 738, 130 L.Ed.2d 640 (1995). Here, despite evidence that a second conversation may have occurred, the military judge found that only one occurred and that it did not concern appellant's trial. *See generally United States v. Campos, supra.* Furthermore, the defense did not protest the president's further participation in this court-martial once this matter came to light at trial. *See* 48 MJ at 780–81. We are satisfied that there was no unlawful command influence as a matter of fact or law in these circumstances. *United States v. Hamilton, supra.*

### (3) Newspaper article

■ Appellant's third complaint of unlawful command influence concerns an article appearing in a base newspaper written by the special court-martial convening authority's SJA after appellant's general court-martial. He contends that Lt Col Dent's article constituted unlawful command influence on the general court-martial authority and his SJA who were then reviewing this case in Texas. He relies on the decision of this Court in *United States v. Wansley,* 46 MJ 335 (1997), for the proposition that such conduct constitutes unlawful command influence.

The appellate court below noted the findings of the military judge on this matter, as follows:

> We also agree with the military judge that the article concerning appellant's conviction in "The Eagle," a 694th Intelligence Group publication, was in no way improper command influence. It merely informed the local community of the results of appel-

lant's trial. The reference to the Navy's Tailhook incident in that article was apparently to emphasize that all military members should be on notice about the possible consequences of sexual misconduct, not to directly liken appellant's crimes to Tailhook. In any case, it was written by Lt Col Dent, the special court-martial convening authority's SJA, who was stationed in Maryland. We found no evidence to indicate it could have possibly affected the general court-martial (GCM) convening authority or his SJA, both in Texas, even if the article had been improper. This is notwithstanding the fact that Lt Col Dent sent a copy of this article to the GCM SJA for informational purposes as a routine part of tracking the preventive law program.

48 MJ at 780.

We agree with the military judge that unlawful command influence did not occur on the basis of this newspaper article and its routine delivery to the general court-martial convening authority. This article was unsigned and basically reported the results of trial to the military community at Fort Meade. The quotes ascribed to a junior legal officer at a subordinate command were consistent with his law enforcement duties and were not directed to the clemency process. We see no violation of Article 37 in this context and we do not read *United States v. Wansley, supra* (a post-trial review-disqualification case) as holding otherwise.

### (4) Stifling clemency recommendation

Appellant's final complaint of unlawful command influence concerns a matter raised for the first time at the *DuBay* hearing which the Court of Criminal Appeals noted was "not addressed in our order for a post-trial hearing." 48 MJ at 780. A member of appellant's court-martial, Captain (Capt) Applegate, testified that he approached Lt Col Dent for legal advice on what a member of a court-martial was legally permitted to say after trial on behalf of a convicted accused in a letter of clemency. *See* RCM 1105(b)(4), Manual for Courts–Martial, United States

(1995 edition) [3] (clemency recommendation by court-martial member). He further stated that Lt Col Dent refused to answer his question and attempted to dissuade him from submitting such a statement by saying, "You don't really want to do that, do you?"

The Government opposed this claim at the *DuBay* hearing on the basis of the testimony of Lt Col Dent who remembered advising Capt Applegate on this matter. He denied making the above noted statement or advising Capt Applegate in any way that he should not submit a clemency letter. The Government also submitted the testimony of Colonel Behrens, who overheard much of their conversation concerning such a statement and confirmed Lt Col Dent's version of this incident. 48 MJ at 780. The military judge at the *DuBay* hearing, however, made no particular findings of fact or conclusions of law on this matter. Instead he generally concluded that appellant's unlawful-command-influence complaints were without merit and that he chose to believe Lt Col Dent's version of events rather than Capt Applegate's in another matter.

We are not a court with factfinding powers and the judge's incomplete findings of fact preclude us from resolving this case on the basis of his lawful exercise of these powers. *Cf. United States v. Campos, supra.* Nevertheless, a factfinding hearing is not required where an accused fails to aver sufficient facts necessary to constitute a legal claim. *See United States v. Ginn,* 47 MJ 236, 246–47 (1997). Here, appellant avers that he was denied a member's clemency letter whose content is unknown except that it may contain inadmissible post-trial statements of a member concerning his prior deliberations in this case. *See* Mil.R.Evid. 606(b), Manual, *supra.*[4] In our view, there was no reasonable possibility that the general court-martial convening authority would have changed his action in this case on this basis. *See United States v. Thomas,* 22 MJ 388, 394 (CMA 1986) (harmless-beyond-a-reasonable-doubt test), *cert. denied,* 479 U.S. 1085, 107 S.Ct. 1289, 94 L.Ed.2d 146 (1987).

The decision of the United States Air Force Court of Criminal Appeals upon further review is affirmed.

---

**3.** This provision appears as RCM 1105(b)(2)(D) in the 1998 Manual and is textually unchanged.

**4.** This provision is unchanged in the 1998 edition of the Manual.