UNITED STATES, Appellee

v.

Mark S. Brisbane, Staff Sergeant
U.S. Air Force, Appellant

No. 05-0136

Crim. App. No. 35384

United States Court of Appeals for the Armed Forces

Argued November 2, 2005

Decided April 28, 2006

BAKER, J., delivered the opinion of the Court, in which GIERKE, C.J., and CRAWFORD, EFFRON, and ERDMANN, JJ., joined.

Counsel

For Appellant: Major Anniece Barber (argued); Lieutenant Colonel Carlos L. McDade, Major Andrew S. Williams, and Major Sandra K. Whittington (on brief); Major Terry L. McElyea.

For Appellee: Captain Jin-Hwa L. Frazier (argued); Lieutenant Colonel Robert V. Combs and Lieutenant Colonel Gary F. Spencer (on brief); Major Kevin P. Steins.

Military Judge: James L. Flanary

**THIS OPINION IS SUBJECT TO REVISION BEFORE FINAL PUBLICATION.**

Judge BAKER delivered the opinion of the Court.

Appellant was tried by general court-martial before a military judge alone. Contrary to his pleas, he was convicted of one specification of indecent acts and one specification of wrongful possession of visual depictions of nude minors, both offenses in violation of Article 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 934 (2000). Appellant was sentenced to a bad-conduct discharge, confinement for twelve months, and reduction to E-1. The convening authority approved only nine months of confinement and waived automatic forfeitures but otherwise approved the sentence as adjudged. The Air Force Court of Criminal Appeals found no error and affirmed. United States v. Brisbane, No. ACM 35384 (A.F. Ct. Crim. App. Nov. 5, 2004).[1]

SUMMARY

For the reasons stated below, we conclude, based on the facts in this case, that Ms. Lynch, the Family Advocacy

---

[1] We granted review of the following issues:

I. WHETHER THE MILITARY JUDGE ERRED IN FAILING TO SUPPRESS APPELLANT'S STATEMENTS TO THE FAMILY ADVOCACY PROVIDER WHERE THOSE STATEMENTS WERE MADE IN RESPONSE TO QUESTIONS POSED WITHOUT AN ARTICLE 31, UNIFORM CODE OF MILITARY JUSTICE, RIGHTS ADVISEMENT.

II. IF SO, WHETHER THE MILITARY JUDGE ERRED IN FAILING TO SUPPRESS ALL EVIDENCE DERIVED FROM APPELLANT'S STATEMENT TO THE FAMILY ADVOCACY PROVIDER BECAUSE AFOSI DID NOT GIVE APPELLANT A CLEANSING WARNING PRIOR TO ITS INTERROGATION OF APPELLANT.

III. DID THE PROSECUTOR PRESENT LEGALLY SUFFICIENT EVIDENCE THAT APPELLANT'S POSSESSION OF VISUAL DEPICTIONS OF NUDE MINORS WAS SERVICE-DISCREDITING OR PREJUDICIAL TO GOOD ORDER AND DISCIPLINE?

treatment manager who initially questioned Appellant, was acting in furtherance of a law enforcement investigation. As a result, Appellant was entitled to a rights advisement under Article 31, UCMJ, 10 U.S.C. § 831 (2000). However, we find the admission of Appellant's statements to Ms. Lynch harmless beyond a reasonable doubt because Appellant repeated the same information, and more, to the Air Force Office of Special Investigations (AFOSI) six weeks later, and these statements were admissible. These subsequent statements were not derivative of Appellant's earlier statements to Ms. Lynch; they were voluntary, and Appellant has not demonstrated that AFOSI engaged in the type of "question-first" tactic addressed by the Supreme Court in Missouri v. Seibert, 542 U.S. 600 (2004). With respect to Issue III, we conclude that the evidence was legally sufficient. Based on the circumstances of Appellant's case, any rational factfinder could find beyond a reasonable doubt that Appellant's possession of child pornography was service-discrediting or prejudicial to good-order and discipline. We affirm.

## BACKGROUND

On or about June 1, 2001, Appellant showed his eight-year-old stepdaughter, S, pictures of naked adult women on his computer in response to her question about what she would look like when she was older. S meant the question in terms of what she would wear when she graduated. Appellant misunderstood the

question, as he told one of his colleagues, to be how would S develop physically. At the time, Appellant's wife was on vacation in Hawaii. S subsequently told a neighbor about the pictures, and the neighbor called Family Advocacy to report the incident.

After Family Advocacy received this "referral," the Child Sexual Maltreatment Response Team (CSMRT)[2] convened. Ms. Lynch, the Family Advocacy treatment manager and a civilian Department of Defense employee, testified that the participants agreed that she, Ms. Lynch, would conduct the initial interviews of Appellant and S.[3] At trial, Ms. Lynch stated that the CSMRT

---

[2]

> The Child Sexual Maltreatment Response Team: Consists of the FAO [Family Advocacy Officer], the AFOSI agent, the JA [Judge Advocate], and optional representatives from other agencies that have child protection responsibilities. This multidisciplinary team plans investigations of suspected abuse, simultaneously minimizing the number of interviews children undergo while effectively gathering pertinent information. CSMRT members can also be members of the FMCMT [Family Maltreatment Case Management Team]. The CSMRT takes coordinated action within 72 hours of any report of child sexual abuse without waiting for a scheduled meeting.

Dep't of the Air Force, Instr. 40-301, Medical Command, Family Advocacy para. 3.2.1. (July 22, 1994) [hereinafter AFI 40-301].

[3] On cross-examination, trial defense counsel and Ms. Lynch had the following exchange:

> Q: Okay. So, you start out, and you get a referral, and you suspect Staff Sergeant Brisbane of an offense?
> A: Yes.
> Q: You notify legal and OSI, and your three organizations meet?
> A: Yes.
> Q: And, all together, that committee decides that you are going to conduct the interview with Staff Sergeant Brisbane?
> A: Yes.
> Q: And, it is even further [sic] based on how far this goes, that you should stop and call OSI, or just proceed?

decided that she would go first “[t]o determine if we had enough information to proceed.” Upon examination by the court, Ms. Lynch responded in the affirmative when the military judge inquired whether she was “normally the one who is the first [ ] to conduct interviews after a CSMRT meeting.”

On June 1, 2001, Ms. Lynch interviewed S and then Appellant. According to Ms. Lynch, she explained to Appellant that he had “limited confidentiality” during their interview. Ms. Lynch did not give Appellant an Article 31 rights advisement. In response to questions from the trial counsel, Ms. Lynch stated that she had never given anyone an Article 31 rights advisement or Miranda warnings and that she had not received any training in the matter because that was “just not part of [her] job.” Ms. Lynch testified at trial that Appellant was “very cooperative” during the interview and that “[h]e seemed relaxed.” Ms. Lynch’s first question to Appellant was: “Did you do it?” Ms. Lynch testified that Appellant told her that his stepdaughter had been asking questions about her body. He then stated that in response he had downloaded some pictures from an adult site on the Internet and had shown them to her.

After Ms. Lynch completed her interviews, the information was forwarded to the Family Maltreatment Case Management Team

---

A: Yes.
Q: Okay, and you made the decision just to proceed?
A: Yes.

(FMCMT).[4] According to Special Agent Corey Allison, AFOSI decided not to pursue the matter at that time because it "lacked credible information to open a substantive investigation." He testified that the matter was reported as a "zero." Special Agent Allison gave the following explanation of a "zero": "It means informational file. It is documented and an inquiry is to be documented for future reference, if necessary." After categorizing the file as a "zero," Special Agent Allison, according to procedure, forwarded the file to a "forensic science consultant."[5] Later, the forensic consultants recommended that AFOSI revisit the case.

On June 27, 2001, the FMCMT met. According to an e-mail dated July 6, 2001, from Sharon K. Burnett, the AFOSI Detachment Commander, additional information was provided during this meeting "which raised some concerns." At trial, defense counsel sought to establish through cross-examination that it was Ms. Lynch's information that prompted AFOSI to open an investigation. However, Special Agent Allison maintained that

---

[4] "The FMCMT consists of medical, investigative, and other appropriate base and community agency representatives as determined by the FAC [Family Advocacy Committee]." AFI 40-301, para. 2.2.3. "The [FMCMT]: . . . .In cases of child sexual abuse: Ensures the child undergoes as few interviews as possible . . . . Monitors the child's safety . . . . Prescribes a sexual abuse treatment program for child sexual abuse offenders who are on active duty." Id. at para. 2.2.3.1.

[5] The record does not provide any additional information with regard to these forensic consultants, i.e., their responsibilities, duty station(s), etc.

it was the recommendation by the forensic science consultant that AFOSI revisit the case that prompted the investigation.

On July 13, 2001, Special Agents Allison and Chris Winters interviewed Appellant in their office.[6] Special Agent Allison testified that they "read [Appellant] his rights, [and] he agreed to speak to us without the presence of an attorney." Special Agent Allison characterized Appellant's demeanor as "calm and forthright." Appellant reduced the content of his interview with AFOSI to a signed statement in which he admitted showing nude adult pictures to his stepdaughter.

After concluding the interview, Special Agent Allison and Jim Scott, a member of the Joint Drug Enforcement Team, accompanied Appellant back to his government quarters where he agreed to show them the pictures he had shown his stepdaughter. After viewing the pictures, Special Agent Allison asked for Appellant's consent to take possession of the computer for analysis. However, after giving consent, but before Special Agent Allison took possession of the computer, Appellant produced on the screen "what looked like thumbnail pictures of naked children." According to Special Agent Allison, Appellant's demeanor at that moment "changed considerably." "He started to shake, visibly sweating, turned red, turned around

[6] The record does not indicate the date on which AFOSI officially opened its investigation, whether it was July 13, 2001, or some prior day.

stammering,” telling the Agent that he “‘thought it was okay to have pictures of child pornography as long as it was for educational purposes.’” Later that day, Appellant signed a confession relating to the child pornography found on his computer.

At some point after initiation of the investigation but before trial, Appellant had a conversation with his neighbor, Staff Sergeant (SSGT) Justin Gilbert, concerning the pictures that Appellant had downloaded and his subsequent interaction with his stepdaughter regarding the pictures. According to SSGT Gilbert, Appellant indicated that he had downloaded some adult pictures in order to answer his stepdaughter’s questions about how she would develop physically as she got older. Appellant further explained to SSGT Gilbert that the pictures were ”tasteful” and were “kind of like you’d find of a girl on the beach.” Appellant went on to describe how the neighbors had heard of this and had reported him to the authorities who in turn had confiscated his computer. Also according to SSGT Gilbert, Appellant stated that “the worst thing that they were going to get him on was that he only had seven pictures of kids on his computer.” At trial SSGT Gilbert testified that he found this conversation “kind of disturbing” to the point that he contacted AFOSI to inquire whether any of the pictures included

images of his children. He learned that none of the images included his children.

Appellant challenges his conviction before this Court on the grounds that: (1) the military judge abused his discretion when he failed to suppress Appellant's statements to the Family Advocacy provider; (2) his subsequent interrogation by Government agents was unconstitutional in light of the Supreme Court's recent decision in Missouri v. Seibert, (3) the absence of a cleansing warning by AFOSI tainted his subsequent statements to them, even though those statements were preceded by a rights warning; and (4) the Government did not present sufficient evidence on the issues of prejudice to good order and service-discrediting conduct regarding his possession of visual depictions of nude minors.

The Government responds that Appellant was not entitled to a rights advisement under Article 31 because the Family Advocacy provider was not working as a law enforcement agent when she interviewed Appellant, and therefore, she was not subject to the UCMJ. The Government further argues that Appellant's subsequent confession to AFOSI was voluntary under all the circumstances and therefore not tainted by his previous admissions to Ms. Lynch. Finally, the Government argues that the prosecution was not required to prove actual harm to the service's reputation to support Appellant's conviction for possession of visual

depictions of nude minors.

## DISCUSSION

### Appellant's Statements to the Family Advocacy Provider

"When there is a motion to suppress a statement on the ground that rights' warnings were not given, [this Court] review[s] the military judge's findings of fact on a clearly-erroneous standard, and . . . conclusions of law de novo." United States v. Swift, 53 M.J. 439, 446 (C.A.A.F. 2000) (citing United States v. Ayala, 43 M.J. 296, 298 (C.A.A.F. 1995)); United States v. Moses, 45 M.J. 132, 135 (C.A.A.F. 1996)).

Article 31(b) reads:

> No person subject to this chapter may interrogate, or request any statement from an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

10 U.S.C. § 831(b) (2000).

Resolution of the first issue in this case turns on whether Ms. Lynch, the Family Advocacy treatment manager, was a "person subject to the code" for the purposes of Article 31(b) and Military Rule of Evidence (M.R.E.) 305(c). Under M.R.E. 305(b)(1), such a person "includes a person acting as a knowing agent of a military unit or of a person subject to the code." We have identified:

> at least two instances when civilian investigators working in conjunction with military officials must comply with Article 31: "(1) When the scope and character of the cooperative efforts demonstrate 'that the two investigations merged into an indivisible entity,' and (2) when the civilian investigator acts in furtherance of any military investigation, or in any sense as an instrument of the military.'"

United States v. Rodriguez, 60 M.J. 239, 252 (C.A.A.F. 2004) (quoting United States v. Penn, 18 C.M.A. 194, 199, 39 C.M.R. 194, 199 (1969) (citations omitted)); see also United States v. Lonetree, 35 M.J. 396 (C.M.A. 1992); United States v. Quillen, 27 M.J. 312, 314 (C.M.A. 1988).

This Court most recently considered the issue of social workers and Article 31 in United States v. Raymond, 38 M.J. 136 (C.M.A. 1993). In that case, this Court held that a psychiatric social worker was not acting as an investigative agent of law enforcement where the appellant arrived without any command-referral document and the social worker had no contact with the command before or after the appellant's walk-in appointment. Id. at 138.

The Court in Raymond also considered the effect of an Army regulation dealing with child abuse: "It is not a law enforcement program; it is a community services program. The cooperative effort required by the regulation does not render every member of the military community a criminal investigator or investigative agent . . . ." Id. at 138-39. Finally, this

Court noted in Raymond that "there is no historical duty of health professions engaged in treatment to warn based on the purpose behind Article 31(b)." Id. at 140.

In United States v. Moreno, this Court considered the admissibility of statements made to a State of Texas Department of Human Services investigator-social worker. 36 M.J. 107, 109 (C.M.A. 1992). In that case, this Court focused on whether the social worker's investigation merged with the military investigation or whether she was acting as an agent of military investigators. Id. at 115. The Court answered both of these questions in the negative based on three findings: (1) lack of "communication or coordination between the two camps"; (2) the social worker "remained in the mode of social worker"; and (3) the social worker pursued her own "limited, state objectives" and cooperated with military authorities "only where necessary to effectuate her own goals." Id. With regard to the first finding, this Court noted, specifically, that the social worker "did not in any way coordinate [her] meeting [with the appellant] with military police or prosecutorial authorities or notify them that she intended to interview appellant." Id.

We now turn to the facts in this case. The military judge found that Ms. Lynch's interviews were "not for any law enforcement purpose." Rather, in the military judge's view, Ms. Lynch's "primary purpose in conducting the interview was for

treatment purposes.” The Air Force court concluded that the “clinical social worker was not ‘functioning as a mere conduit for military authorities’ nor was there evidence of any understanding between her and military authorities ‘designed to subvert the purposes of Article 31.’” Brisbane, No. ACM 35384, slip op. at 1. As such, the Air Force court found that, in her independent role, Ms. Lynch was not obligated to advise Appellant in accordance with Article 31(b). Id. at 1-2.

AFOSI and the Family Advocacy treatment manager are integral parts of the CSMRT. They work closely on initial assessments of complaints. Consequently, the initial complaint that Appellant was suspected of having acted inappropriately with his stepdaughter was assessed at a CSMRT meeting. The CSMRT decided to have Ms. Lynch proceed first with the interviews of Appellant and his stepdaughter to determine whether they “had enough information to proceed.” According to Ms. Lynch, the CSMRT made this decision “all together.” Once Ms. Lynch obtained Appellant’s admissions, she reported them to the FMCMT. Although the AFOSI representatives on the FMCMT initially decided not to pursue the matter, they were in receipt of Ms. Lynch’s information. Finally, despite stating that her role in questioning Appellant was to provide treatment, Ms. Lynch also stated that she was not treating Appellant for any

condition.[7] These facts render the military judge's finding that Ms. Lynch "had not been approached by anyone in the Air Force command structure or by law enforcement personnel in an attempt to enlist her aid in collecting information to prosecute the case" untenable. Furthermore, while there was no direct evidence of an understanding between Ms. Lynch and military authorities "'designed to subvert the purposes of Article 31,'" this is not the test for whether the UCMJ applies. Brisbane, No. ACM 35384, slip op. at 1 (quoting United States v. Moreno, 36 M.J. 107, 117 (C.M.A. 1992)). Nor is the test an issue of

---

[7] On cross-examination, trial defense counsel and Ms. Lynch had the following exchange:

> Q: Ms. Lynch, have you ever provided treatment to Staff Sergeant Brisbane?
> A: Yes.
> Q: You've provided him with treatment?
> A: I'm not sure of your definition of "provided treatment," but I've provided him counseling.
> Q: Okay. The question was simply whether you've given him treatment within your definition?
> A: Yes.
> Q: Isn't it that you just recently said that you were not there for treatment in our earlier interviews?
> A: I don't recall that.
> Q: Okay. Weren't you there actually to kind of monitor how Staff Sergeant Brisbane was dealing with this situation as he came closer to court?
> A: Yes.
> Q: Okay. So, what kind of treatment did you provide?
> A: We did more to monitor him, like you said, more of a fit for duty assessment, monitored depression, anxiety, and how he was coping with the stress.
> Q: Okay. So, you were basically meeting with him to see how he was doing?
> A: Yes.
> Q: Is there any condition for which you were treating him?
> A: No.
> Q: Ever?
> A: No.

the questioner's "primary purpose." Rather, as noted in Rodriguez and discussed above, this Court has identified at least two instances when civilians working in conjunction with military officials must comply with Article 31. See Rodriguez, 60 M.J. at 252 (quoting Penn, 18 C.M.A. at 199, 39 C.M.R. at 199 (1969) (citations omitted). In this case, Ms. Lynch acted in furtherance of a military investigation. It does not matter that her actions in this regard were not deliberately aimed at subverting Appellant's rights. Nor does it matter what her "primary purpose" might have been.[8]

We also distinguish this case from Raymond and Moreno. Unlike the situation in Raymond, Appellant's command directed him to see Ms. Lynch. Furthermore, Ms. Lynch was in regular contact, both before and after her interview with Appellant, with members of the military law enforcement community. Cf. Raymond, 38 M.J. at 139; Moreno, 36 M.J. at 115. Finally, Ms. Lynch was fully aware of Appellant's prior contact (or lack

[8] The parties do not argue that Ms. Lynch was providing emergency medical treatment, cf. United States v. Moore, 32 M.J. 56, 60 (C.M.A. 1991) (finding that a psychiatric nurse who provided appellant with emergency medical treatment at his request was acting "only in a legitimate medical capacity" when she questioned him about his suspected sexual abuse of his stepdaughters), nor did the need to ask incriminating questions arise during otherwise routine medical procedures. See United States v. Fisher, 21 C.M.A. 223, 225, 44 C.M.R. 277, 279 (1972) ("A medical doctor who questions an individual solely to obtain information upon which to predicate a diagnosis, so that he can prescribe appropriate medical treatment or care for the individual, is not performing an investigative or disciplinary function; neither is he engaged in perfecting a criminal case against the individual. His questioning of the accused is not, therefore, within the reach of Article 31."). We agree that these cases are inapplicable to the facts of this case.

thereof) with AFOSI in this case. Cf. Raymond, 38 M.J. at 138; Moreno, 36 M.J. at 109. As noted, it was a team decision, made by the members of the CSMRT, which included a representative from AFOSI, that Ms. Lynch would conduct the first interview.

Although we note that the "cooperative effort" required by AFI 40-301 in this case "does not render every member of the military community a criminal investigator or investigative agent," Ms. Lynch's actions in this case were more akin to an investigative agent than a social worker. Raymond, 38 M.J. at 138-39. On cross-examination, Ms. Lynch stated that the first thing she asked appellant when he arrived for his interview was "[d]id you do it?" Cf. United States v. Swift, 53 M.J. 439, 447 (C.A.A.F. 2000) (holding that the accused's supervisor, a military criminal investigator, should have advised Swift of his rights when he demanded that he respond to certain "accusations"). In addition, Ms. Lynch stated that she did not in fact treat Appellant for any condition.

We conclude that the record does not support the military judge's findings that Ms. Lynch was not acting "for any law enforcement purpose," but rather was engaged in treating Appellant. In our view, the record supports the contrary conclusion that Ms. Lynch was acting as an "investigative agent of law enforcement," by virtue of her close coordination with base legal and investigative personnel. Raymond, 38 M.J. at

136. Therefore, as a threshold matter, Ms. Lynch was a "person subject to the code" for the purposes of Article 31(b) and M.R.E. 305(c). The next question we must consider is whether the other requirements of Article 31 were met such that Appellant was entitled to a rights advisement. The military judge did not make findings in this regard because he determined that Ms. Lynch did not meet the threshold requirement of being a person subject to the code.

As we noted in United States v. Cohen, 63 M.J. 45, 49 (C.A.A.F. 2006), Article 31(b) contains four textual predicates. First, the article applies to persons subject to the UCMJ. Second and third, the article applies to interrogation or requests for any statements from "an accused or a person suspected of an offense." Fourth, the right extends to statements regarding the offense(s) of which the person questioned is accused or suspected.

In Cohen, we sought to provide a context for this Court's decisions with regard to the second and third textual predicates. See id. at 49-50. However, unlike Cohen, this case does not present any question as to whether Ms. Lynch was requesting a statement from a person she suspected of an offense. See United States v. Bradley, 51 M.J. 437, 441 (C.A.A.F. 1999). "[A]ssessing all the facts and circumstances at the time of the interview," it is clear to us that Ms. Lynch

was acting in an official law enforcement or disciplinary capacity. United States v. Swift, 53 M.J. at 446 (quoting United States v. Good, 32 M.J. 105, 108 (C.A.A.F. 1991)). As noted earlier, Ms. Lynch, in conjunction with the law enforcement representatives on the CSMRT, decided to conduct the first interview of Appellant. According to her testimony, the reason for her interview was to decide if they had sufficient evidence to proceed, ostensibly, with a case against Appellant. In keeping with this, the first question she asked Appellant during their meeting was whether he committed the offense. Finally, Ms. Lynch admitted that she never provided Appellant with any treatment. Unlike Cohen, where the inspector general acted independently, consulting only with legal personnel on an ad hoc basis, all of Ms. Lynch's actions were coordinated with AFOSI and other members of the CSMRT involved in law enforcement activities.

With respect to Article 31(b)'s third textual predicate, this Court applies an objective test. "Whether a person is a suspect is an objective question that is answered by considering all the facts and circumstances at the time of the interview to determine whether the military questioner believed or reasonably should have believed that the servicemember committed an offense." Swift, 53 M.J. at 446; Good, 32 M.J. at 108. During

her testimony, Ms. Lynch stated that she suspected Appellant of an offense at their first meeting.

We conclude that the remaining requirements of Article 31(b) were met in this case. As a result, Ms. Lynch should have informed Appellant of his Article 31 rights prior to the interview. Even though Ms. Lynch advised Appellant that his statements were not confidential, and he spoke to her voluntarily, this does not otherwise negate the requirements of Article 31(b). See M.R.E. 304(a), M.R.E. 305(a). Therefore, Appellant's statements to Ms. Lynch, the Family Advocacy treatment manager, should have been suppressed by the military judge and could not be used to support his convictions. However, this does not resolve the question of whether Appellant's subsequent statements to AFOSI were admissible. Nor does it answer the question of whether the pictures found on Appellant's computer should have been admitted as the basis for the second specification of Charge I, wrongful and knowing possession of visual depictions of nude minors.

Appellant's Statements to AFOSI

With regard to Appellant's second and third challenges, we must decide whether AFOSI's subsequent interrogation of Appellant was unconstitutional in light of the Supreme Court's recent decision in Missouri v. Seibert, and whether the absence

of a cleansing warning tainted Appellant’s statements, even though those statements were preceded by a full rights warning.

The military judge did not make any findings with regard to whether Appellant’s subsequent statements to AFOSI were voluntary because Appellant only challenged their admission as derivative evidence at trial. In light of its conclusion that Ms. Lynch acted independently, the Air Force court found the issue of whether AFOSI properly questioned Appellant moot. Brisbane, No. ACM 35384, slip op. at 2. This Court has looked to the Supreme Court’s decision in Oregon v. Elstad, 470 U.S. 298 (1985), which distinguished between two classes of involuntary confessions, for guidance on evaluating the admissibility of a confession obtained subsequent to one that is deemed illegally obtained:

> [W]here the earlier confession was “involuntary” only because the suspect had not been properly warned of his panoply of rights to silence and to counsel, the voluntariness of the second confession is determined by the totality of the circumstances. The earlier, unwarned statement is a factor in this total picture, but it does not presumptively taint the subsequent confession.

United States v. Cuento, 60 M.J. 106, 109 (C.A.A.F. 2004) (quoting United States v. Phillips, 32 M.J. 76, 79 (C.M.A. 1991)). One of the circumstances this Court takes into account

is the presence of a "cleansing warning,"[9] however, the absence of such is not fatal to a finding of voluntariness. Cuento, 60 M.J. at 109.

The classic listing of the other factors used in a voluntariness analysis is found in the Supreme Court's decision in Schneckloth v. Bustamonte:

> In determining whether a defendant's will was overborne in a particular case, the Court has assessed the totality of all the surrounding circumstances -- both the characteristics of the accused and the details of the interrogation. Some of the factors taken into account have included the youth of the accused, his lack of education, or his low intelligence, the lack of any advice to the accused of his constitutional right, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep.

412 U.S. 218, 226 (1973) (citations omitted).

In his brief, Appellant also argues that the Supreme Court's recent decision in Seibert applies to the facts of this case. In Seibert, police arrested the respondent following the deaths of the respondent's son and another teenager. 542 U.S. at 604. At the suppression hearing, the interviewing officer admitted that he consciously withheld Miranda warnings, "thus resorting to an interrogation technique he had been taught: question first, then give the warnings, and then repeat the question 'until I get the answer that she's already provided

---

[9] A cleansing warning is one in which the "accused [is] warned that a previous statement cannot be used against him." Cuento, 60 M.J. at 109.

once.'" Id. at 605-06. In Seibert, the Court invalidated the "police protocol" described above that called for elicitation of an unwarned confession, followed by rights warnings, and elicitation of the same confession. 542 U.S. at 604. Because the officer in Seibert was very candid about the procedure, the Court noted that "the focus is on facts apart from intent that show the question-first tactic at work." Id. at 616 n.6.

According to Appellant, the base legal office and AFOSI similarly engaged in a purposeful plan to evade his constitutional rights by arranging for Ms. Lynch to interview him first, without a proper rights advisement. Cf. Seibert, 542 U.S. at 605-06. Then, Appellant argues, AFOSI sought to interrogate him with the benefit of his earlier unwarned statements to Ms. Lynch.

Although Seibert altered the inquiry under Elstad, the facts in Appellant's case are distinguishable. First, in contrast to Seibert, the two interviews in Appellant's case occurred almost six weeks apart. Further, although there was coordination between AFOSI and the Family Advocacy staff, the record does not demonstrate a deliberate effort aimed at securing an unwarned confession for later use in securing a warned confession. Cf. United States v. Phillips, 32 M.J. 76 (C.M.A. 1991) (suppressing appellant's statements where this Court found that the Naval Investigative Service special agent

used earlier, unwarned interviews and statements as a starting point for his interrogation). According to Special Agent Allison, AFOSI did receive information about the incident through the FMCMT. However, Special Agent Allison denied that Ms. Lynch's June 1, 2001, interview was the reason that AFOSI pursued its investigation. Rather, AFOSI's decision to interview Appellant was based on a forensic consultant's recommendation that AFOSI pursue an investigation. Seibert does not ban coordination among individuals. Rather, it is aimed at a very specific, deliberate practice of successive interrogations to secure an admissible confession. What happened in this case does not rise to that level.

Because the evidence in this case does not support a conclusion that Family Advocacy and AFOSI engaged in the type of unconstitutional practice prohibited by Seibert, the test for whether the second confession is admissible is whether it was voluntary under all the circumstances. See Cuento, 60 M.J. at 109.

Here, there was no cleansing warning because Special Agent Allison and his colleagues did not believe that Appellant was entitled to a warning when he first confessed to Ms. Lynch. Therefore, our determination of whether Appellant's second confession to Special Agent Allison was voluntary hinges on other factors, including those identified in Bustamonte. First,

Appellant's interview with Special Agent Allison occurred almost a month and a half after his initial interview with Ms. Lynch. This was a substantial amount of time for Appellant to weigh the pros and cons of continuing to talk with military authorities about showing pictures of nude adult women to his stepdaughter. Second, Appellant was a mature, experienced member of the military. At the time of the incident, Appellant was a twenty-eight-year-old staff sergeant with almost ten years of military service. Third, the conditions of Appellant's second interview were not coercive or inhumane. Special Agent Allison testified that Appellant was asked to come in and speak with AFOSI about an incident involving his daughter. After Appellant waived his rights and agreed to give a written statement, Special Agent Allison and a colleague followed Appellant back to his house so that Appellant could show them the pictures he had shown to his stepdaughter. There is nothing to suggest that Appellant's free will was overborne.

This conclusion is supported by the fact that Appellant did not believe that he had done anything criminal in showing pictures to his stepdaughter. In his written confession, Appellant admits only that his approach was "incorrect." According to Special Agent Allison's testimony, it was not until Appellant brought up pornographic pictures of children on his computer that he became nervous. Before that, Special Agent

Allison testified that Appellant was "calm." This comports with Ms. Lynch's description of Appellant's demeanor during her initial interview with him.

Based on the foregoing, while we agree with Appellant that he was entitled to a rights warnings prior to his interview with Ms. Lynch, we find that his statements to AFOSI were voluntary under the circumstances and not barred by the Supreme Court's decision in Seibert, notwithstanding the absence of a cleansing warning. Thus, the military judge did not err in admitting these statements or the evidence subsequently seized from Appellant's computer. In light of these later, more detailed statements describing his conduct, we conclude that the admission of Appellant's initial statements to Ms. Lynch was harmless beyond a reasonable doubt. See United States v. Hallock, 27 M.J. 146 (C.M.A. 1988) (citing United States v. Remai, 19 M.J. 229, 233 (C.M.A.1985)).

Appellant's Possession of the Pictures

We turn now to the final issue in the case, whether the evidence was legally sufficient to sustain Appellant's conviction for possession of child pornography under clauses one and two of Article 134. The Air Force court found that "[A]ppellant's possession of . . . pictures was prejudicial to good order and discipline or of a nature to bring discredit upon the armed forces." Brisbane, No. ACM 35384, slip op. at 2.

Appellant now argues that there is no evidence that his possession of pictures of nude minors was service-discrediting or conduct prejudicial to good order and discipline. The Government argues that Appellant's mere possession of sexually explicit images of minors is an act involving moral turpitude, and as such, is inherently prejudicial to good order and discipline and service-discrediting.

The knowing possession of images depicting sexually explicit conduct by minors, whether actual or virtual, when determined to be service-discrediting conduct or conduct prejudicial to good order and discipline, is an offense under Article 134. United States v. Mason, 60 M.J. 15, 20 (C.A.A.F. 2004). However, Ashcroft v. Free Speech Coalition, 535 U.S. 234 (2002), created a "constitutional dimension" to an Article 134 charge that did not exist previously. As a result, the elements of service discredit or prejudicial conduct must be considered in the context of a military member's possession of what might be considered virtual child pornography, or pornography the Supreme Court otherwise determined was constitutionally protected in a civilian context. Mason, 60 M.J. at 19; United States v. O'Connor, 58 M.J. 450, 454 (C.A.A.F. 2003). In light of Free Speech Coalition we look to the record to determine whether the evidence demonstrates that an accused's conduct is service-discrediting and/or prejudicial to good order and

discipline, even if such conduct would have been protected in a civilian context.

After taking Appellant's statement regarding the showing of nude adult photographs to his stepdaughter, the AFOSI investigators accompanied Appellant to his home. Based on Appellant's consent, the investigators entered the home where Appellant showed the agents images of nude adults he had shown to his stepdaughter and sought to explain why he had done so. In the course of this conduct, Appellant inadvertently displayed images of child pornography to the agents.

Following this disclosure, Appellant was charged with a violation of clauses one and two of Article 134.[10] Appellant subsequently told his neighbor, SSGT Gilbert, that he possessed seven pictures of child pornography. This disclosure alarmed SSGT Gilbert enough that he contacted AFOSI to determine whether any of the pictures included images of his children. "Viewing the evidence in the light most favorable to the prosecution," we conclude that "any rational trier of fact" could have found beyond a reasonable doubt that Appellant's possession of the pictures in question was prejudicial to good order and discipline or service-discrediting. Jackson v. Virginia, 443

[10] The record of trial does not establish whether the photographs contained actual or virtual child pornography. As a result, for the sake of our analysis we will assume, without deciding, that the pictures were virtual in nature.

U.S. 307, 319 (1979); United States v. Turner, 25 M.J. 324 (C.M.A. 1987).[11]

DECISION

The decision of the United Air Force Court of Criminal Appeals is affirmed.

[11] Because we conclude that the record contains specific evidence that Appellant's conduct was service-discrediting and/or prejudicial to good order and discipline, we need not consider how, if at all, Free Speech Coalition applies to the Government's argument that Appellant's conduct, as an act of moral turpitude, was inherently prejudicial or service-discrediting.