**CORRECTED COPY**

# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
HAIGHT, PENLAND, and WOLFE
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**Specialist DARRIE C. RANDALL JR.**
**United States Army, Appellant**

ARMY 20130452

Headquarters, 21st Theater Sustainment Command
Reynold P. Masterson, Military Judge
Colonel Ralph J. Tremaglio, III, Staff Judge Advocate (pretrial)
Colonel Jonathan A. Kent, Staff Judge Advocate (post-trial)

For Appellant:  William E. Cassara, Esq. (argued); Captain Robert H. Meek, III, JA; William E. Cassara, Esq. (on brief).

For Appellee:  Captain Linda Chavez, JA (argued); Major A.G. Courie III, JA; Major Steven J. Collins, JA; Captain Benjamin W. Hogan, JA (on brief).

17 December 2015

----------------------------------
MEMORANDUM OPINION
----------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

WOLFE, Judge:

A general court-martial composed of officer and enlisted members convicted appellant, contrary to his pleas, of one specification of aggravated assault in which grievous bodily harm is intentionally inflicted upon a child under the age of 16 years, one specification of aggravated assault with a means likely to inflict grievous bodily harm upon a child under the age of 16 years, and three specifications of assault consummated by battery upon a child under the age of 16 years, in violation of Article 128, Uniform Code of Military Justice, 10 U.S.C § 934 (2012) [hereinafter UCMJ].  Three of appellant's children, one by birth and two by marriage, were the

victims of the offenses.[1]  The panel sentenced appellant to a dishonorable discharge, confinement for five years, and reduction to the grade of E-1.  The convening authority approved the adjudged sentence, and credited appellant with twenty-six days of confinement.

Appellant's case is now before us for review pursuant to Article 66, UCMJ. Appellant raises three assignments of error, two of which merit discussion and one of which merits relief.

## BACKGROUND

Ms. DS lived in Vogelweh housing in Kaiseralautern, Germany.  On 14 July 2012, Ms. DS was outside her unit talking and smoking with seven friends she had invited over for dinner.  Her conversation was interrupted by a child's scream coming from across the courtyard in the vicinity of appellant's apartment.  Ms. DS then heard appellant, whose voice she knew, yelling "I told you to get the Goddamn . . . ."  Appellant's yell was interrupted by a "smack, smack, smack" sound, followed by additional screams of a child.  She described the "smack" as being "loud and clear" and that it echoed in the courtyard.  As Ms. DS, her husband, and at least one other neighbor started running towards appellant's apartment she heard the windows of appellant's apartment being closed.  When she got to appellant's door, she heard appellant's wife repeating "why did you hit him there?"  Ms. DS called the police and was told they had already been notified.

Sergeant (SGT) JM, a military police (MP) officer, arrived at appellant's apartment with his partner.  As they were ringing the doorbell, Staff Sergeant (SSG) JC, another MP, and his partner also arrived.  Appellant answered the door and invited all four police officers into the apartment.  Once inside, the officers observed three of appellant's children in the house (LC, appellant's 8 year old stepdaughter; PR, appellant's six year old son; and appellant's four year old daughter).  As appellant began to gather some belongings in expectation of being removed from the apartment, SSG JC attempted to engage appellant's wife who looked distressed, but she declined to say anything.  However, after appellant went into the bedroom to gather some items, appellant's wife led SSG JC onto the apartment's balcony.  On the balcony was TC, her fourth and oldest child and appellant's stepson.  TC was ten years old.

TC was on the balcony pressing an ice pack against an injury to his left eye. Staff Sergeant JC described it as a "black eye," but one that resembled what he had

---

[1] Upon motion by the government and after the introduction of evidence, the military judge dismissed two specifications of child endangerment, in violation of Article 134, UCMJ, as well as one specification of assault consummated by battery upon a child under the age of 16 involving appellant's youngest child, his four year old daughter.

2

previously seen in a mixed martial arts fight. TC was taken to a German hospital and was hospitalized for a week. TC told the treating German hospital staff that "he was accidentally hit with a belt" by his father. Further examination of TC revealed welts on his back and legs. An examination of x-rays and CT scans revealed that TC's orbital bone was fractured at the base of his eye-socket. Pictures of TC taken at the hospital show significant trauma.

TC testified that both his mother and appellant would give him and all but his youngest sibling a "whooping," usually in the form of being hit with a belt. He testified that his father would hit him with a particular belt that he called the "ass-master" on his back and legs. On the night in question, after a dispute about cleaning the kitchen, his mother had "whooped" him "two to three" times on the back. However, after appellant overheard TC talking back to his mother, appellant took the belt from her. TC said that his father hit him with the belt and knocked him to the floor and proceeded to beat him on the face, back, and legs with the belt. Later, when the police rang the doorbell, TC testified that appellant hid him on the balcony where he was subsequently discovered by SSG JC.

TC's siblings corroborated his testimony. PR testified that the police came to the house the day appellant hit TC "super hard" and appellant put TC in the hospital.[2] LC, when asked what belts are for, testified that belts are for holding up clothes and for "whipping." LC was reluctant to testify but stated that both her mother and appellant would hit her with the belt. She further stated that there were secrets she was not supposed to tell and that she would get in trouble if she told. When asked where on her body appellant hit her, she refused to answer and stated that this was one of the secrets she wasn't supposed to talk about.

Prior to trial on the merits, appellant filed a timely motion to suppress statements he made after being removed from his apartment and escorted in handcuffs out of the housing area by the police. Testimony from that hearing, documents submitted as part of the hearing, and the trial testimony of witnesses provided the relevant facts.

After the MPs removed appellant from his apartment they attempted to interrogate him that same day. Appellant was advised of his Article 31(b), UCMJ, rights and his rights under *Miranda*, and stated that he wanted a lawyer. At some point later, appellant was released. Appellant was not placed in pretrial confinement.

---

[2] PR testified that TC's eye injury was from TC hitting a stepstool and that he saw the stepstool cause the injury. However, PR also stated that this version of events was what appellant told him to say.

Two days later, on 17 July 2012, appellant's chain of command ordered him to go see a provider at the Family Advocacy Program (FAP). At FAP, Captain (CPT) MP, a social worker, met with appellant and handed him intake paperwork. Appellant told CPT MP that he wanted to see a lawyer, and CPT MP released him.

The following day, on 18 July 2012, SSG AA relayed an order from the company commander that appellant had to immediately return to FAP. According to SSG AA, appellant protested that he first wanted to see a lawyer. Staff Sergeant AA testified he then told appellant "you have to go to the appointment, no one is forcing you to talk to them, and that [appellant] should explain that to the FAP counselor . . . ."

During the second visit, CPT MP again gave appellant intake paperwork. Included in the intake paperwork was a document explaining the limits of confidentiality. The document, which was a standard form, explained that while efforts would be made to safeguard communications, there were exceptions. In addition to instances where the patient presented a danger to themselves or others as well as serious offenses such as war crimes, the document specifically listed child abuse as an exception. Appellant signed the document stating that he had read and understood the document. The document did not inform appellant that he was free to refuse to talk to CPT MP, nor did it advise appellant of his Article 31(b), UCMJ, rights.

After signing the document, CPT MP asked appellant "what do you think brought you in here?" In response to the question, appellant initially complained of marital issues. Appellant and CPT MP then had a sixty minute counseling session which included admissions from appellant that he had hit TC. The record is silent as to how the conversation turned from marital problems to child abuse and whether appellant's admissions were spontaneous or were in response to a question from CPT MP. Captain MP did not read appellant his rights under Article 31(b).

While CPT MP was aware that appellant had been command referred to him and that the military police had been involved, there is no evidence in the record that CPT MP knew *why* appellant had been sent to see him. There is no specific evidence that CPT MP knew that appellant was facing allegations of child abuse or knew the circumstances of the police involvement. While such knowledge could easily be inferred from the circumstances, we also note that the FAP addresses matters that often fall short of criminal conduct.

At the suppression hearing, CPT MP testified that he did not require anyone to talk to him nor fill out the intake paperwork and that sometimes people left the form

4

blank.[3]  In response to being asked if the second visit was coordinated by the chain of command, CPT MP answered, "I believe I talked to him, telling him that, you know, he has to come back and talk to us.  It is part of standard procedure."  On appeal, appellant cites this as an order from CPT MP to appellant to return and engage in substantive conversation.  This response could also be understood to mean that CPT MP spoke with appellant's command to arrange for his return.[4]  Under the totality of the circumstances, although the record is unclear and occasionally contradictory, we find that appellant was at a minimum required to return to see CPT MP the next day for the purpose of filling out the intake paperwork that was not completed during the first visit.

As to the session itself, CPT MP testified that his purpose in asking questions was therapeutic and that his role was to design a course of treatment for both offenders and victims.  After the session, CPT MP filled out an entry in appellant's "Chronological Record of Medical Care" that included treatment plan goals of preventing abuse and improving communication and conflict resolution skills and parenting skills.  He further testified that in a situation such as this, he would necessarily brief the Case Review Committee (CRC) on the case.  He testified that the CRC includes members from various fields, to include a representative from the Army Criminal Investigation Command (CID).  There was no evidence that CPT MP coordinated with the CRC or members of law enforcement prior to meeting with appellant.

Twelve days after meeting with CPT MP for the second time, appellant was interrogated by CID, where, after being informed of his rights under Article 31(b), he terminated the interview by again stating his desire to speak to an attorney.

The military judge denied the defense's motion to suppress appellant's statements to CPT MP.[5]  The military judge made factual findings, including 1) the purpose of CPT MP when meeting appellant was therapeutic; 2) CPT MP's purpose was to treat appellant; 3) appellant was not in custody and could have left or refused to talk to CPT MP at any time; 4) the only order appellant received was to report to CPT MP's office; and 5) that CPT MP was not conducting a law enforcement investigation or acting in a disciplinary role.

---

[3] Captain MP also testified he would not speak to someone who did not acknowledge receiving the document explaining the limits of confidentiality.

[4] The latter interpretation would be consistent with the testimony from appellant's supervisor that the command arranged the second visit.

[5] The military judge granted the defense's motion to suppress other statements made by appellant to CPT MP's supervisor.

At trial, CPT MP testified that during the course of the counseling session appellant admitted to hitting TC with a belt but that appellant denied hitting TC in the face. Captain MP further testified that at the end of the counseling session appellant retracted the admission that he had hit TC. Captain MP's testimony did *not* include any admission by appellant about the amount of force used, that any hitting exceeded that allowed under parental discipline, or that appellant was responsible for TC's facial injuries.

## DISCUSSION

### A. *Statements to Military Social Worker*

In his first assignment of error, appellant claims the military judge abused his discretion in failing to suppress appellant's statements after CPT MP failed to advise appellant of his rights under Article 31(b), UCMJ. Although related, we see the issue more clearly as whether the government honored appellant's invocation of his right to counsel.

In *United States v. Raymond*, after the appellant had invoked his right to silence, the CID agent interviewing him recommended that appellant seek counseling. Appellant then made statements to a social worker which were later admitted at trial. Judge Wiss clearly stated the legal dilemma as follows:

> Perhaps, the real difficulty with any analysis as to whether physicians and social workers are, in law, an adjunct of law enforcement by virtue of their regulatory reporting responsibility is this: The regulatory duty is in combination with absence of any evidentiary privilege in a court-martial concerning communications between someone who is a criminal suspect or accused but who also is a patient. Reporting spousal or child abuse that comes to the attention of medical personnel quite clearly is a high social priority, and it is not conceptually unique to the military community. In combination, however, with the lack of any evidentiary privilege regarding the substance of communications between the likely abuser and the medical personnel—at least in the context where that abuser is a patient of the medical personnel—the reporting requirement can be an end-run around Article 31.
>
> . . . .
>
> *. . . . I believe it is entirely logical to argue under certain circumstances that the Government—through interaction*

6

> *of two provisions of law that are entirely within its power*
> *to effect—has improperly undermined Article 31.*

*United States v. Raymond*, 38 M.J. 136, 143-44 (C.M.A. 1993) (Wiss, J., concurring) (internal citations omitted) (emphasis added).

We have no doubt if a law enforcement investigation employs the medical community as an end-run around Article 31 or Military Rule of Evidence [hereinafter Mil. R. Evid.] 305, exclusion of the subject statements is the proper result. That was the case in *United States v. Brisbane*, 63 M.J. 106 (C.A.A.F. 2006) (discussed below)*,* where, for all practical purposes, law enforcement dispatched the social worker to interview the subject. *Raymond*, like this case, presents the harder issue of what happens when the military judge finds there is no such coordination and the social worker's motives are pure, but the overall effect on appellant remains concerning. To paraphrase Judge Wiss, can the confluence of two legal imperatives deprive appellant of the benefit of Article 31 and Mil. R. Evid. 305, even if no individual expressly acted in a manner contrary to Article 31 proscriptions? And secondly, if so, is application of the exclusionary rule the correct result?

The majority in *Raymond*, and Judge Wiss in his specific concurrence, answered these questions in the negative. That is, our superior court was not willing to extend the protections of Article 31 and Mil. R. Evid. 305, and the drastic remedy of the exclusionary rule, such that "every member of the military community [is rendered] a criminal investigator or investigative agent." *Raymond*, 38 M.J. at 138-39.

"We review a military judge's ruling on a motion to suppress . . . for an abuse of discretion." *United States v. Ayala,* 43 M.J. 296, 298 (C.A.A.F. 1995). "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion." *United States v. McElhaney,* 54 M.J. 120, 130 (C.A.A.F. 2000). "When there is a motion to suppress a statement on the ground that rights' warnings were not given, we review the military judge's findings of fact on a clearly-erroneous standard, and we review conclusions of law *de novo*." *United States v. Swift,* 53 M.J. 439, 446 (C.A.A.F. 2000). "[O]n a mixed question of law and fact . . . a military judge abuses his discretion if his findings of fact are clearly erroneous or his conclusions of law are incorrect." *Ayala,* 43 M.J. at 298.

### 1. *Were the Military Judge's Findings of Fact Clearly Erroneous?*

We start the analysis with the military judge's findings of fact and determine that they were not erroneous. That is, although reasonable persons could have come to the opposite conclusion, there was sufficient factual material in the record to support the judge's conclusions.

First, the military judge found that CPT MP's session with appellant was for a therapeutic purpose. Captain MP testified as to the therapeutic purpose of his sessions with appellant, and no substantial evidence to the contrary was introduced. Captain MP's entry in appellant's "Chronological Record of Medical Care" corroborated the treatment purpose of the visit, including treatment plan goals of preventing abuse, and improving communication and conflict resolution skills and parenting skills.[6] In this regard, this case is clearly distinguishable from *Brisbane*, where our superior court found in a similar case that a social worker was acting as an agent of law enforcement. *Brisbane*, 63 M.J. 106. In *Brisbane*, the social worker had "close coordination" with law enforcement prior to interviewing the appellant. *Id.* at 113. With law enforcement input, the social worker was dispatched to the interview to see "whether they 'had enough information to proceed.'" *Id.* at 112. The first question the *Brisbane* social worker asked was "did you do it." *Id.* at 113. In contrast, in this case there is no evidence that CPT MP had any coordination with law enforcement before meeting with appellant. CPT MP's first question to appellant was "why do you think you are here," and was followed by a discussion of marital tensions that were not directly related to the allegations of child abuse. Accordingly, the military judge's findings that CPT MP was acting with a therapeutic purpose and that he was not conducting a law enforcement investigation or acting in a disciplinary role were not clearly erroneous.

Second, the military judge addressed the circumstances by which appellant was returned to CPT MP's office. The military judge found that the only order appellant received was to report to CPT MP's office. That is, appellant was not ordered to talk to CPT MP, and could have refused to talk to CPT MP. That finding is supported in the record by SSG AA's advice to appellant, explaining the nature of the order, and that it required only appellant's presence, and did not require appellant to talk to CPT MP. Additionally, CPT MP's testimony about how he conducts patient intake can be understood to mean that a patient is free to decline filling out forms and participating in a session. Although there is evidence to the contrary, the military judge's findings in this regard were not clearly erroneous.

2. *Was CPT MP Asking Questions for a Law Enforcement or Disciplinary Purpose?*

"Because of the effect of superior rank or official position upon one subject to military law, the mere asking of a question under certain circumstances is the equivalent of a command." *United States v. Duga,* 10 M.J. 206, 209 (C.M.A. 1981), *overruled in part by United States v. Jones*, 73 M.J. 357, 361-62 (C.A.A.F. 2014). Congress passed Article 31(b), UCMJ, "to provide servicepersons with a protection which, at the time of the Uniform Code's enactment, was almost unknown in

---

[6] The Chronological Record of Medical Care, which included the statements the defense sought to suppress, was attached to the defense's motion and considered by the military judge.

American courts, but which was deemed necessary because of subtle pressures which existed in military society." *Id.* "The Article 31(b) warning requirement provides members of the armed forces with statutory assurance that the standard military requirement for a full and complete response to a superior's inquiry does not apply in a situation when the privilege against self-incrimination may be invoked." *Swift,* 53 M.J. at 445.

In *Jones*, our superior court recently interpreted Article 31(b), UCMJ as follows:

> Although Article 31(b), UCMJ[7], seems straightforward, were these textual predicates applied literally, Article 31(b) would potentially have a comprehensive and unintended reach into all aspects of military life and mission. Because the mandatory exclusion of statements taken in violation of Article 31, UCMJ, is a severe remedy, this Court has interpreted the second textual predicates—interrogation and the taking of 'any' statement—in context, and in a manner consistent with Congress' intent that the article protect the constitutional right against self-incrimination. Under Article 31(b)'s second requirement, rights warnings are required if the person conducting the questioning is participating in an official law enforcement or disciplinary investigation or inquiry, as opposed to having a personal motivation for the inquiry.

73 M.J. at 361 (internal quotation marks and internal citations omitted).

In *Jones*, the United States Court of Appeals for the Armed Forces (C.A.A.F.) further clarified the lens with which we evaluate whether someone is conducting official questioning, rejecting the subjective prong established by *Duga*, and instead requiring a purely objective analysis. 73 M.J. at 362. Accordingly, the proper inquiry is determined by assessing all the facts and circumstances at the time of the

---

[7] "No person subject to this chapter may interrogate, or request any information from, an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial." UCMJ art. 31(b).

interview to "determine whether the military questioner was acting *or* could reasonably be considered to be acting in an official law-enforcement or disciplinary capacity."[8] *Id.* (internal quotation marks and citations omitted) (emphasis added).

We note that CPT MP was certainly asking questions for *an* official purpose—his official purpose being his duties as a social worker. Additionally, depending on what was discussed, his conversation with appellant was not confidential and could be—and in this case was—reported to law enforcement. Our superior court has held that when a military medical professional is questioning an individual for diagnostic purposes, there is no requirement to give an Article 31 warning. *United States v. Fisher,* 21 U.S.C.M.A. 223, 44 C.M.R. 277 (1972); *United States v. Baker,* 11 U.S.C.M.A. 313, 29 C.M.R. 129 (1960) (Navy doctor questioning appellant regarding track marks on his arm was asking the questions so he could help him with an insomnia problem); *Cf. United States v. Moreno,* 36 M.J. 107, 114 (C.M.A. 1992) (A Texas state mental health worker's inquiry was not so "merged" with a military law enforcement or unit investigation as to require Article 31(b) warnings.). In *United States v. Moore,* 32 M.J. 56 (1992), the Court of Military Appeals held that a psychiatric nurse was not required to warn a child sexual abuse suspect. The court determined the nurse's "official capacity as a government employee at a military hospital and her *regulatory duty* to file reports of suspected child abuse with her military supervisors" did not require a rights warning. *Id.* at 60. "Even absent regulatory reporting requirements, there is no historical duty of health professionals engaged in treatment to warn based on the purpose behind Article 31(b)." *Raymond*, 38 M.J. at 140 (citing *United States v. Gibson,* 3 U.S.C.M.A. 746, 14 C.M.R. 164 (1954)).

---

[8] Although our superior court stated this as a disjunctive inquiry, a full reading of the case appears to imply a conjunctive intent at least under certain circumstances. In footnote 5, the C.A.A.F. made clear that no rights warnings are required when an undercover agent, acting in an *official* capacity, interrogates a suspect because "undercover officials and informants do not usually place the accused in a position where a reasonable person in the accused's position would feel compelled to reply to questions." *Jones*, 73 M.J. at 361 n.5. That is, a military questioner, even one acting in an official capacity as a law enforcement agent, is *insufficient* to trigger a rights warning. Accordingly, it appears that the intent of our superior court was that in some circumstances, official questioning occurs whenever the military questioner is acting in an official law enforcement or disciplinary capacity *and* could reasonably be considered by the suspect to be acting in an official law-enforcement or disciplinary capacity. With such an understanding, *Jones* provides a consistent lens through which to review matters raised under Article 31(b) and maintains fidelity to Article 31's purpose.

Accordingly, we find CPT MP was not acting in a law enforcement or disciplinary capacity.

3. *Did CPT MP's Questions of Appellant Violate Appellant's Rights to Counsel?*

Although often intermixed in practice, there is no right to counsel under Article 31. Rather, the right to consult counsel during a custodial interrogation stems from the 5th Amendment. *See Edwards v. Arizona*, 451 U.S. 477, 482 (1981) (citing *Miranda v. Arizona*, 384 U.S. 436 (1966)). The President, in an exercise of his rulemaking authority under Article 36, UCMJ, has incorporated 5th Amendment jurisprudence in Mil. R. Evid. 305(d). *See* Mil. R. Evid. 305(d)(1) (addressing the right to counsel in custodial interrogations). A statement that is obtained in violation of Mil. R. Evid. 305(d) is "involuntary" under Mil. R. Evid. 305(a), and is accordingly inadmissible under Mil. R. Evid. 304(a) if an accused makes a timely motion to suppress the statement.

The evidence in this case is that appellant was led away from his home in handcuffs and was subsequently informed in writing that he had a right to counsel. Appellant then invoked his right, initialing the statement "I want a lawyer. I will not make any statement or answer any question until I talk to a lawyer." While the exact circumstances of the initial interrogation are unclear, we assume that it was a custodial interrogation based on the limited facts admitted, the fact that appellant was informed he had rights that accrue during a custodial interrogation, and that any gap in the factual record inures to the benefit of appellant given the government's burden of proof. *See* Mil. R. Evid. 305. Accordingly, we find that appellant asserted his right to counsel during a custodial interrogation, triggering his rights under Mil. R. Evid. 305(d). Under Mil. R. Evid. 305(f)(2), once a suspect invokes his right to counsel, questioning must cease "until counsel is present."

Subsequent to invoking his right to counsel, however, appellant was released. While release does not terminate the prohibition on further questioning, *see Maryland v. Shatzer*, 559 U.S. 98, 110-11 (2010) (providing for a 14-day window to seek counsel), the prohibition generally applies only to further questioning as part of a law enforcement or disciplinary investigation. Mil. R. Evid. 305(d)(1)(A) (applying rule to interrogations conducted by persons who are required to give rights warnings under Article 31). Non-custodial questioning that is not part of a law enforcement or disciplinary investigation, whether by an inquisitive roommate or a social worker asking questions for a therapeutic purpose, does not trigger Mil. R. Evid. 305(d). Nonetheless, the 14-day period provided by *Shatzer*, is informative, as it provides guidance with respect to the time a criminal suspect should be given to consult with a lawyer.

Additionally, in other cases, our superior court has looked to whether the purposes of Article 31 and Mil. R. Evid. 305(d) were being served in determining

whether to suppress a statement. In *United States v. Mitchell*, 51 M.J. 234 (C.A.A.F. 1999) the court ruled that it was error to admit a statement made after a request for counsel, even when the questioner was not acting as part of a law enforcement or disciplinary investigation. That is, although the statement fell outside of Mil. R. Evid. 305(d), the C.A.A.F., citing *Edwards v. Arizona*, nonetheless determined that admitting the statement was error. *Id.* at 237-40.

In *Mitchell,* the appellant's supervisor was visiting him in jail as part of a command visit and asked "Was it worth it?" *Id.* at 237. The supervisor knew both the charges that appellant was facing and that he had made a prior request for counsel. Without finding that the supervisor's question violated Mil. R. Evid. 305(d), the C.A.A.F. determined that the appellant's incriminating response was inadmissible under the totality of the circumstances, concluding that "[i]n these circumstances . . . despite [the supervisor's] personal curiosity, the inherently compelling pressures of the initial interrogation continued to exist . . . ." *Id.* at 239-40 (internal quotation marks and citation omitted).

Just as our superior court found in *Mitchell*, reviewing the totality of the unusual confluence of circumstances leads us to the conclusion that it was error to admit appellant's statements made to CPT MP. During a custodial interrogation, appellant asked to speak to an attorney. After being released, appellant was then ordered to go see a military social worker. Appellant again asked to see an attorney, was released, but was then again ordered to return to see the social worker the very next day. Appellant's statements to CPT MP were unprivileged and not confidential. *See* Mil. R. Evid. 513(d)(2) (child abuse exception). If the government made any effort to effectuate appellant's request for counsel, no evidence of such efforts was introduced at the suppression hearing or at trial. Instead, appellant's commander repeatedly, and likely confusingly from appellant's perspective, ordered appellant to go to the Family Advocacy Program based on the same events that prompted his arrest.

We note that our finding in this case is driven by very specific and unusual facts at issue. Notably, the facts do not support the conclusion that appellant's chain of command acted surreptitiously or actively sought to bypass appellant's right to counsel. Although we do not find that CPT MP was acting as an agent of law enforcement, the unique circumstances of these facts did deprive appellant of the ability to consult with counsel under *Edwards v. Arizona* prior to making admissions, and the admission of his subsequent statements was, therefore, error.

### 4. *Prejudice*

Having found error, we must test for prejudice. "Prior to affirming a case in which there has been constitutional error, a reviewing court must be convinced beyond a reasonable doubt that the error was harmless." *United States v. Toohey*, 63

M.J. 353, 356 (C.A.A.F. 2006) (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)); *see also United States v. Mott*, 72 M.J. 319, 332 (C.A.A.F. 2013).

In the present case, appellant's inadmissible statement was an admission that he had hit TC with a belt. Appellant's statements to CPT MP specifically denied hitting TC in the face and by inference, causing the injuries to his eye.

The evidence that appellant used physical force to discipline TC was overwhelming at trial. All three children testified that both parents used a belt to physically discipline TC. Appellant's neighbor also testified that she heard appellant hitting TC. Statements made by the children to doctors, consistent with the medical exams, also supported the use of physical discipline.

Moreover, in closing, appellant's defense counsel did not argue that appellant's statement to CPT MP was unreliable or should be ignored, but rather that the panel should *credit* his statement, as it was exculpatory evidence of the most serious offense of aggravated assault. Appellant's admissions to CPT MP included a denial of hitting TC in the face. Appellant's civilian defense counsel argued "What evidence is there to contradict [appellant's] statement?"

In short, the matters in contention at trial were not whether appellant physically disciplined his children, but rather: 1) whether the force appellant used on TC was lawful?; and 2) whether appellant, his wife, or an accident caused TC's facial injuries? Appellant's statements to CPT MP were not inconsistent with the defense theory of the case. Appellant's defense centered on his good character, testimony that TC's eye injury was the result of an accident, and arguing and inferring that appellant's wife could have caused TC's injuries. Accordingly, any error from the admission of appellant's statements to CPT MP was harmless beyond a reasonable doubt.

## B. *Error in the Result of Trial*

In his second assignment of error, appellant asserts that the result of trial incorrectly reflects that he was convicted of two specifications of aggravated assault. The government concedes the error. We agree and will order correction of the promulgating order.

Appellant was charged with two specifications of aggravated assault arising out of the same act. Specification 1 of Charge I alleged that appellant intentionally inflicted grievous bodily harm on TC by striking him with a belt and fracturing his eye socket. Specification 2 of Charge I alleged that appellant, by striking TC with a belt, used a means likely to inflict grievous bodily harm. At trial, the government stated that the specifications were charged in the alternative and it was clear that both specifications involved the same event. When appellant was convicted of both offenses, the military judge merged the two offenses for findings, effectively

dismissing Specification 2. *See United States v. Elespuru*, 73 M.J. 326 (C.A.A.F. 2014). The military judge informed the panel of the merger, and the panel determined appellant's sentence based on the correct findings.

Nonetheless, the Report of Result of Trial (DD Form 2707-1) incorrectly reflects that appellant was convicted of two specifications of aggravated assault instead of only one. The convening authority's action approving the sentence implicitly approved the findings as reflected in the result of trial. *See United States v. Diaz*, 40 M.J. 335 (C.M.A. 1994).

On appeal, in addition to ordering the correction of the promulgating order, appellant asks this court to return the record to the convening authority for a new staff judge advocate recommendation (SJAR) and action.

Consistent with the forfeiture[9] provisions of Article 60(d), UCMJ, Rule for Courts-Martial 1106(f)(6) provides that "[f]ailure of counsel for the accused to comment on any matter in the [SJAR] or attached to the recommendation in a timely matter shall [forfeit] later claim of error with regard to such matter in the absence of plain error." *See also United States v. Green,* 37 M.J. 380, 385 (C.M.A. 1993) (failure to object to racial identifiers in SJAR forfeited absent plain error); *United States v. Drayton*, 40 M.J. 447 (C.M.A. 1994); *see also United States v. Wright*, ARMY 20010343, 2002 CCA LEXIS 434 (Army Ct. Crim. App. 14 Jan. 2002) (mem. op.) (testing for plain error when convening authority was mistakenly informed that accused's AWOL conviction was terminated by apprehension); *United States v. Porter*, ARMY 20090974, 2010 CCA LEXIS 355 (Army Ct. Crim. App. 20 Oct. 2010) (summ. disp.); *United States v. Porter*, ARMY 200611229, 2008 CCA LEXIS 542 (Army Ct. Crim. App. 30 Jun. 2008) (mem. op.).

"Under a plain error analysis, [an appellant] 'has the burden of demonstrating that: (1) there was error; (2) the error was plain or obvious; and (3) the error materially prejudiced a substantial right of the accused." *United States v. Payne*, 73 M.J. 19, 23-24 (C.A.A.F. 2014) (internal quotation marks and citations omitted).

In the present case, the result of trial reported to the convening authority and attached to the SJAR omits notation that appellant's two convictions were merged at

---

[9] Article 60(d) and Rule for Courts-Martial 1106(f)(6) use the word "waiver." For consistency, and in fidelity to the analytical construct set forth by our superior court, we will use the term "forfeiture." *United States v. Gladue*, 67 M.J. 311, 313 (C.A.A.F. 2009) ("Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right. The distinction between the terms is important. If an appellant has forfeited a right by failing to raise it at trial, we review for plain error. When, on the other hand, an appellant intentionally waives a known right at trial, it is extinguished and may not be raised on appeal.") (internal quotations marks and internal citations omitted).

trial. However, we find no material prejudice to a substantial right and appellant points us towards none. As both specifications describe the exact same misconduct, merging Specification 2 into Specification 1 did not alter the gravamen of the offenses or change appellant's culpability or degree of criminality. Accordingly, having found no material prejudice, the correction of the promulgating order to correctly reflect what occurred at trial sufficiently remedies the omission.

The promulgating order shall be corrected to reflect that Specification 2 of Charge I was merged at trial with Specification 1 of Charge I and that Specification 2 of Charge I was dismissed. The remaining findings of guilty and sentence are AFFIRMED. All rights, privileges, and property, of which appellant he been deprived by virtue of the correction to the promulgation order by this decision are ordered restored.[10]

Senior Judge HAIGHT and Judge PENLAND concur.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court

---

[10] Corrected.