# UNITED STATES NAVY-MARINE CORPS
# COURT OF CRIMINAL APPEALS
# WASHINGTON, D.C.

**Before**
**J.A. FISCHER, K.M. MCDONALD, D.C. KING**
**Appellate Military Judges**

### UNITED STATES OF AMERICA

v.

### JOSEPH A. DYAS
### STAFF SERGEANT (E-6), U.S. MARINE CORPS

### NMCCA 201400250
### SPECIAL COURT-MARTIAL

**Sentence Adjudged:** 10 January 2014.
**Military Judge:** LtCol D.M. Jones, USMC.
**Convening Authority:** Commanding General, Marine Corps
Recruit Depot/Eastern Recruiting Region, Parris Island, SC.
**Staff Judge Advocate's Recommendation:** LtCol K.M. Navin,
USMC.
**For Appellant:** Jeffrey S. Stephens, Esq.; LT Ryan Aikin,
JAGC, USN.
**For Appellee:** Capt Cory Carver, USMC; Capt Matthew Harris,
USMC.

**9 April 2015**

---------------------------------------------------
### OPINION OF THE COURT
---------------------------------------------------

**THIS OPINION DOES NOT SERVE AS BINDING PRECEDENT, BUT MAY BE CITED AS
PERSUASIVE AUTHORITY UNDER NMCCA RULE OF PRACTICE AND PROCEDURE 18.2.**

KING, Judge:

A military judge, sitting as a special court-martial
convicted the appellant, contrary to his pleas, of one
specification of false official statement and two specifications
of aggravated assault on a child under the age of 16, in
violation of Articles 107 and 128, Uniform Code of Military

Justice, 10 U.S.C. §§ 907 and 928.[1]  The court sentenced the appellant to 180 days of confinement, reduction to pay grade E-1 and a bad-conduct discharge.  The convening authority approved the sentence as adjudged, but as a matter of clemency deferred and then waived for six months all automatic forfeitures.

The appellant now raises six assignments of error: (1) the evidence is legally and factually insufficient to support the findings of guilt; (2) the military judge erred by denying the defense requests for a witness; (3) the military judge erred by denying a motion to suppress the testimony of a Family Advocacy Counselor; (4) the cumulative effect of numerous plain errors denied the appellant a fair trial; (5) expert testimony repeatedly elicited by the trial counsel that the victim's injuries would have to be nonaccidental without information provided by the appellant or his wife impermissibly shifted the burden of persuasion to the appellant; and (6) trial defense counsel were ineffective for failing to call essential witnesses and failing to object to inadmissible testimony.

After carefully considering the pleadings of the parties and the record of trial, we conclude that the findings and the sentence are correct in law and fact and that no error materially prejudicial to the substantial rights of the appellant was committed.[2]  Arts. 59(a) and 66(c), UCMJ.

## Background

On 8 September 2011, the appellant and his wife took custody of their 20-month-old nephew, GS.  The appellant and his wife also had two daughters, aged 4 and 2.  On 23 December 2011, at about 1215 hours the appellant returned home from work and took the three children to a duck pond, Wal-Mart, and the Commissary to give his wife time to herself.  According to the appellant, GS was acting normally while he was with the appellant shopping.  The appellant's wife then met the appellant so she could retrieve her wallet.  Mrs. Dyas informed medical personnel that when she saw GS at around 1600, GS was "awake[,]

---

[1] The appellant was acquitted of several other specifications of battery and aggravated assault against the same victim, as well as two specifications of child endangerment in violation of Article 134, UCMJ.

[2] We have considered assignments of error (2) and (4) and find no error materially prejudicial to a substantial right.  *United States v. Clifton*, 35 M.J. 79, 81 (C.M.A. 1992).

alert [and] crying for her."[3]  On the way home, the appellant claimed that GS fell asleep.

Arriving home at around 1700, the appellant stated that he took a sleeping GS upstairs and placed him in his bed.  GS slept through dinner and when the appellant went upstairs he found GS lethargic and unable to stand on his own.  Mrs. Dyas had a neighbor call 9-1-1, and the child was transported to Beaufort Memorial Hospital (BMH), arriving just before 2000.  At BMH, GS was "unresponsive, seizuring and his injuries included bruises to both sides of the face, chin, as well as petechial hemorrhaging [(bruising)]on the abdomen and that a CT scan revealed his brain had shifted and there was hemorrhaging within his brain."[4]  Additionally, GS potentially had injuries to his liver and his bowel.[5]

When questioned, the appellant denied dropping or shaking the child, or doing anything that might have caused these injuries.  Mrs. Dyas informed medical personnel that GS had had surgery on a testicle, fell down often, bruised easily, and had recently fallen out of a laundry basket and bitten off part of his tongue.  Mrs. Dyas was similarly unable to provide any explanation for GS's current life-threatening injuries.  Based upon this information, BMH personnel reported the circumstances to the base Provost Marshal's Office which then contacted the Naval Criminal Investigative Service (NCIS).  Additional facts necessary to resolve the assignments of error are included below.

## Legal and Factual Sufficiency

Article 66(c), UCMJ, 10 U.S.C. § 866(c), requires that we approve only those findings of guilty we determine to be correct in both law and fact, and we review legal and factual sufficiency *de novo*.  *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002).  The test for legal sufficiency is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt."  *United States v. Turner*, 25 M.J. 324, 324-25 (C.M.A. 1987).  Moreover, "[i]n resolving legal-sufficiency questions, [we are] bound to draw every reasonable inference from the evidence of record in

---

[3] Record at 428.

[4] *Id.* at 244.

[5] *Id.* at 421.

favor of the prosecution." *United States v. Blocker*, 32 M.J. 281, 284 (C.M.A. 1991) (citations omitted).

The test for factual sufficiency is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, we are convinced of the appellant's guilt beyond a reasonable doubt. *Turner*, 25 M.J. at 325.

The elements of aggravated assault in this case are:

(1) That the appellant did bodily harm to GS;
(2) That the appellant did so with a certain weapon, means, or force;
(3) That the means or force was unlawful;
(4) That the means or force was used in a manner likely to produce death or grievous bodily harm; and
(5) That GS was a child under the age of 16 years.

MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.), Part IV, ¶ 54(b)(4)(a).

The appellant does not take issue with the fact that GS was injured or that the means of his injury were likely to produce death or grievous bodily harm, and we find the evidence on these elements sufficient. Instead, the appellant claims the Government offered no direct evidence that he caused these injuries to GS. Specifically, the appellant argues that another person who had access to GS prior to when appellant took the children from the home to go shopping could have caused the injuries to GS. For reasons discussed *infra*, we hold that while no direct evidence was offered that the appellant injured GS, the circumstantial evidence that he did so was both legally and factually sufficient.

First, the trial and defense experts testified that the injuries to GS were "acute," meaning recent. However, the expert witnesses varied on the timeframe during which the injuries could have been incurred. Dr. Kinsman, a pediatric neurologist testified that the injuries happened within 24 hours of GS arriving at the hospital and that there would have been no delay between injury and symptoms. Dr. Fagan, a pediatric radiologist testified that the injuries could have occurred up to 72 hours prior to arrival at BMH. Dr. Amaya, board certified as a pediatrician and as a child abuse pediatrician, was more

4

specific, testifying that the injuries likely occurred between 1500-1900 hours on 23 December 2011. Finally, Dr. Hebra, a chief of pediatric surgery, testified that the injuries likely occurred within 12 hours prior to GS arriving at the hospital.

The defense called Dr. Carter, a pediatric radiologist who testified that the injuries likely occurred less than three days prior to presentation. In addition, Dr. Martin, a pediatrician and child abuse pediatrician, testified that the injuries likely occurred 3-48 hours prior to GS arriving at the hospital.

The appellant now argues that since the experts differed as to when the injuries were caused, and since the Government failed to prove that the appellant had access to GS prior to 1215 on 23 December, the evidence is insufficient to prove beyond a reasonable doubt that the appellant was the one who injured GS.

"Reasonable doubt . . . does not mean the evidence must be free from conflict." *United States v. Rankin*, 63 M.J. 552, 557 (N.M.Ct.Crim.App. 2006), *aff'd*, 64 M.J. 348 (C.A.A.F. 2007) (citation omitted). In this case, Dr. Amaya testified that the injuries to GS occurred during the time that the appellant had sole care of GS. In addition, the Government offered evidence that GS had no symptoms of significant injury in the hours or days before 9-1-1 was called. This, coupled with Dr. Kinsman's testimony that there was likely no delay between injury and the presence of symptoms, provided ample information for the military judge to conclude, beyond a reasonable doubt, that the appellant caused GS's injuries. We concur with that finding.[6]

### Testimony of Ms. Dutton

The appellant next avers that the military judge erred when he failed to suppress the testimony of Ms. Dutton, a Family Advocacy Counselor, because Ms. Dutton failed to inform the appellant of his Article 31(b), UCMJ, rights prior to questioning him.

---

[6] The appellant was also convicted of making a false official statement by answering "no" when asked by an NCIS Agent if he knew how GS sustained his injuries. In light of our holding that the record is legally and factually sufficient to affirm the appellant's convictions for aggravated assault, we likewise find the record sufficient to support a finding of guilty to making a false official statement.

In February 2012, the appellant was notified by his company first sergeant that he "had to go see Ms. Dutton."[7]  Ms. Dutton was a counselor at Marine Corps Air Station, Beaufort and performed assessments for the Incident Determination Committee (IDC).  The purpose for her meeting with the appellant was to conduct a "biopsychosocial assessment" of the appellant that would be provided to the IDC.  The purpose of the IDC was to "treat and recommend therapy and education" for the Marine in order to "provide interventions to prevent their escalation of violence within the family."[8]  The appellant arranged an appointment to see Ms. Dutton and arrived at that appointment unescorted.  At her meeting with the appellant, Ms. Dutton explained the IDC process, that she was gathering information for that committee's review, and informed the appellant that he did not need to provide information.  The appellant chose to participate and made statements to Ms. Dutton that the Government learned of only a few days before trial.  In fact, Ms. Dutton refused to provide her notes or to disclose what the appellant had informed her, forcing the Government to subpoena this information.  Ms. Dutton then testified that the appellant found GS to be an added "stressor" on his family;[9] that she believed the appellant was inconsistent in his explanations about the events of that day; and also that he had provided information about the night in question that was inconsistent with his wife's explanations.

When there is a motion to suppress a statement because Article 31(b) warnings were not provided, we review the military judge's findings of fact on a clearly erroneous standard and conclusions of law *de novo*.  *United States v. Cohen*, 63 M.J. 45, 49 (C.A.A.F. 2006).

Article 31(b), UCMJ, states:

> No person subject to this chapter may interrogate, or request any statement from an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

---

[7]  Record at 141.

[8]  *Id.* at 160.

[9]  *Id.* at 514.

"Thus, Article 31(b), UCMJ, warnings are required when (1) a person subject to the UCMJ, (2) interrogates or requests any statement, (3) from an accused or person suspected of an offense, and (4) the statements regard the offense of which the person questioned is accused or suspected." *United States v. Jones*, 73 M.J. 357, 361 (C.A.A.F. 2014) (citation and footnotes omitted).

Resolution of this issue turns on whether Ms. Dutton was a "person subject to the code." Under MILITARY RULE OF EVIDENCE 305(b)(1), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.), such a person "includes a person acting as a knowing agent of a military unit or of a person subject to the code." Following pretrial litigation of this issue, the military judge found that Ms. Dutton was not an agent of the Government seeking to elicit an incriminating response from the appellant, was not a person subject to the UCMJ, did not obtain the appellant's confession through the use of coercion, and did not merge her investigation with the investigation of law enforcement.[10] Instead, the military judge found that Ms. Dutton's objective was to "provide treatment and education" to the appellant and that she was not acting in a "law enforcement-type function."[11] In so finding, the military judge found as important factors that Ms. Dutton waited to conduct her assessment until after the NCIS investigation was completed; that she did not give her notes or reports to law enforcement; and that Ms. Dutton never "threatened or promised [the appellant] anything."[12] The record provides abundant support for the military judge's findings of fact and they are not clearly erroneous.

Nor do we find his legal conclusions erroneous. The Court of Appeals for the Armed Forces (C.A.A.F.) has identified "at least two instances when civilian investigators working in conjunction with military officials must comply with Article 31: '(1) When the scope and character of the cooperative efforts demonstrate that the two investigations merged into an indivisible entity, and (2) when the civilian investigator acts in furtherance of any military investigation, or in any sense as an instrument of the military.'" *United States v. Rodriguez*, 60 M.J. 239, 252 (C.A.A.F. 2004) (quoting *United States v. Penn*, 39 C.M.R. 194, 199 (C.M.A. 1969) (internal quotation marks omitted).

---

[10] *Id.* at 197-98.

[11] *Id.* at 192.

[12] *Id.* at 197-98.

7

As a rule, health professionals engaged in treatment will not fall into these categories. However, in *United States v. Brisbane*, 63 M.J. 106, 108 (C.A.A.F. 2006), upon which the appellant relies, the C.A.A.F. found that a Family Advocacy Representative (FAR) should have provided Article 31(b), UCMJ, warnings to the accused after a Family Advocacy committee, which included a legal officer and a military law enforcement agent, agreed that the FAR would conduct the initial interview of the accused. The C.A.A.F. found that Brisbane's command had directed him to see the FAR, that she worked in close coordination with the legal office and law enforcement before and after her questioning of the accused, that she suspected the accused of an offense at their first meeting, that her investigatory purpose could be seen in her first question when she asked the appellant if he committed the crime, and that she ultimately provided no treatment to Brisbane. *Id.* at 112-14. On these facts, the C.A.A.F. concluded the actions of this particular FAR "were more akin to an investigative agent than a social worker." *Id.* at 113 (citation omitted).

The facts of this case are dissimilar to those of *Brisbane*. While the appellant may have been directed to see Ms. Dutton, the record is clear that Ms. Dutton was not coordinating with law enforcement. In fact, the only contact Ms. Dutton had with law enforcement was to ensure that the law enforcement investigation was complete before she asked to see the appellant. We also note that the purpose of Ms. Dutton's assessment was to gather information to assist the IDC in recommending treatment, that Ms. Dutton's notes were not provided to the Government, and that Ms. Dutton even refused to disclose the appellant's statements when sought by the Government. Under these circumstances, we cannot conclude that Ms. Dutton was acting as an "'investigative agent of law enforcement.'" *Brisbane*, 63 M.J. at 113 (quoting *United States v. Raymond*, 38 M.J. 136, 137 (C.M.A. 1993)). As such, the military judge did not err by denying the defense motions to suppress Ms. Dutton's testimony.

## Burden of Persuasion Shift

Next, the defense claims that the trial counsel was permitted to impermissibly shift the burden of persuasion to the appellant and that trial counsel's rebuttal argument, in which she stated that there was "unrefuted evidence that the accused

8

. . . never wanted [GS]" was plain error.[13]

Absent plain error, failure to object to improper findings argument waives the objection. RULE FOR COURTS-MARTIAL 919(c), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.). To find plain error, we must be convinced: (1) that there was error; (2) that it was plain or obvious; and (3) that it materially prejudiced a substantial right of the appellant. *United States v. Sweeney,* 70 M.J. 296, 304 (C.A.A.F. 2011) (citing *United States v. Harcrow,* 66 M.J. 154, 158 (C.A.A.F. 2008).

While it is well-settled that the trial counsel may not comment on the appellant's exercise of his constitutional rights, *see United States v. Edwards*, 35 M.J. 351, 355 (C.M.A. 1992), the Government may comment on the failure of a defendant to refute Government evidence or to support his own claims. A "constitutional violation occurs only if either the defendant alone has the information to contradict the government evidence referred to or the jury 'naturally and necessarily' would interpret the summation as comment on the failure of the accused to testify." *United States v. Carter*, 61 M.J. 30, 33 (C.A.A.F. 2005) (citations omitted).

Moreover, "under the 'invited response' or 'invited reply' doctrine, the prosecution is not prohibited from offering a comment that provides a fair response to claims made by the defense." *Id.* (citing *United States v. Gilley*, 56 M.J. 113, 120-21 (C.A.A.F. 2001)). "In the course of reviewing whether an appellant was deprived of a fair trial by such comments, the question an appellate court must resolve is whether, viewed within the context of the entire trial . . . defense counsel's comments clearly invited the reply." *United States v. Lewis*, 69 M.J. 379, 384 (C.A.A.F. 2011) (citation and internal quotation marks omitted).

During his closing argument, appellant's defense counsel argued that the Government offered no motive for appellant to injure GS:

---

[13] Record at 662. The appellant also claims that "by eliciting expert opinion that the injuries to GS were nonaccidental, i.e., intentional, based on information that had been provided by Appellant, the trial counsel ... impermissibly shifted the burden of persuasion to Appellant to rebut these opinions by testifying." Appellant's Brief of 19 Nov 2014 at 29. We have analyzed this portion of the assignment of error and find it lacks merit. *Clifton*, 35 M.J. at 81.

9

They've tried to say that it was the holiday period and
[GS] was dumped upon the [appellant], there [were] some
financial issues, et cetera; but no motive to show you
why [the appellant] would all of a sudden flip a switch
and brutalize [GS].[14]

In rebuttal, the trial counsel replied:

The government has put on unrefuted evidence that the
[appellant] in this case never wanted the child, the
child was too much for him to handle, he was causing
financial strain on his perfect little family of four,
and he couldn't take it.  Not only that, but that he
never showed any remorse during his interview with Ms.
Dutton, never even—any concern about the child's
injuries . . . .[15]

Under these circumstances, we find the trial counsel's rebuttal
argument a fair response to the defense challenge to proof of
motive.  Accordingly, we find no error.  Nor would we find error
if the "invited response" doctrine were inapplicable, as the
defense could have questioned the appellant's wife in order to
contradict the Government's evidence of her husband's motive to
injure GS.[16]

### Ineffective Assistance of Counsel

Finally, we turn to the appellant's claim that trial
defense counsel were ineffective.  The Sixth Amendment right to
effective assistance of counsel at trials by court-martial is a
fundamental right of service members.  *United States v. Knight*,
53 M.J. 340, 342 (C.A.A.F. 2000) (citing *United States v.
Palenius*, 2 M.J. 86 (C.M.A. 1977)).  We apply the two-prong test
set forth by the Supreme Court in *Strickland v. Washington*, 466
U.S. 668, 687 (1984) to determine whether counsel rendered
ineffective representation.  "The burden on each prong rests
with the appellant challenging his counsel's performance."
*United States v. Davis*, 60 M.J. 469, 473 (C.A.A.F. 2005).

The first prong requires the appellant to show that
counsel's performance fell below an objective standard of

---

[14]  Record at 661.

[15]  *Id.* at 662.

[16]  Mrs. Dyas, who testified for the Government, was also on the defense
witness list, but was never called by the defense on the merits.

reasonableness, indicating that counsel was not functioning as counsel within the meaning of the Sixth Amendment. *United States v. Terlep*, 57 M.J. 344, 349 (C.A.A.F. 2002). Our review of counsel's performance is highly deferential and is buttressed by a strong presumption that counsel provided adequate representation. *United States v. Garcia*, 59 M.J. 447, 450 (C.A.A.F. 2004).

The second prong requires a showing of prejudice resulting from counsel's deficient performance. *Strickland*, 466 U.S. at 687. Such prejudice must result in the denial "of a fair trial, a trial whose result is unreliable." *United States v. Dewrell*, 55 M.J. 131, 133 (C.A.A.F. 2001) (citation and internal quotation marks omitted). The appropriate test for this prejudice is whether there is a reasonable probability that, but for counsel's error, there would have been a different result. *United States v. Quick*, 59 M.J. 383, 387 (C.A.A.F. 2004).

Ineffective assistance of counsel involves a mixed question of law and fact. *United States v. Anderson*, 55 M.J. 198, 201 (C.A.A.F. 2001). The ultimate determinations of whether defense counsel were deficient and whether the deficiency was prejudicial are reviewed *de novo*. *Id.; United States v. McClain*, 50 M.J. 483, 487 (C.A.A.F. 1999).

"When reviewing ineffectiveness claims, 'a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the [appellant].' . . . Rather, '[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.'" *United States v. Datavs*, 71 M.J. 420, 424-25 (C.A.A.F. 2012) (quoting *Strickland*, 466 U.S. at 697). We follow that course here.

The appellant alleges his counsel were ineffective for failing to object to inadmissible testimony and for failing to call essential witnesses. Regarding the inadmissible testimony, the appellant claims his trial defense team failed to object to the following testimony: (1) the opinion of the ambulance driver that he believed GS had been abused; (2) the testimony from treating nurses that the appellant's history about GS seemed "rehearsed" and that he was "fake crying"; (3) the testimony of expert witnesses that GS's injuries were "nonaccidental"; (4) and Dr. Amaya's profile testimony that children are more often abused on the holidays, in families with financial stresses, and when the child is male and developmentally delayed.

11

Regarding the failure to call witnesses, the appellant argues that trial defense counsel were ineffective because: (1) they abandoned their original defense that GS's injuries could have been accidental after vowing in their opening statement to call witnesses to offer evidence of that defense;[17] (2) that they conceded that GS's injuries were "concerning for nonaccidental" trauma; and (3) they failed to call Mrs. Dyas to elicit testimony that persons other than the appellant had access to GS and thus may have caused the injuries.

We hold that the appellant has failed to demonstrate prejudice sufficient to result in the denial of a fair trial or a trial whose result is unreliable. This is so for several reasons. First, this was a judge alone trial presided over by an experienced military judge, who is "presumed to know the law and to follow it, absent clear evidence to the contrary." *United States v. Mason*, 45 M.J. 483, 484 (C.A.A.F. 1997) (citations omitted). Therefore, to the extent the appellant failed to object to any inadmissible evidence, we will presume the military judge disregarded that evidence and the appellant therefore suffered no prejudice from its admission.[18]

Second, we are unconvinced that trial defense counsel's decision to abandon their theory that accidental trauma caused

---

[17] In his opening statement, trial defense counsel said:

> You will hear testimony from Francis [C], from Kristin [L], and Susan [H]. Those are occupational therapists and special educators who observed [GS]. They will tell you about [GS's] slow registration; about his forward ambulation, meaning he lead[s] with his head; his decrease in fine and gross motor skills; and his decrease in coordination skills. You will hear from lay witnesses, namely Staff Sergeant Christopher [M], his wife Aimee [M]. You will hear from Sergeant [C]. You will hear from Donna [H] who saw this for themselves -- from a lay witness perspective. They, too, realized that something was wrong with [GS].

Record at 223. None of these witnesses were called during the findings phase of the appellant's court-martial, with the exception of Aimee [M], who testified mainly that GS had a bruise and a cut on his chin on 22 December.

[18] The defense objected to the trial counsel asking a nurse whether "the bruises that you saw in [GS was] consistent with the bruising that you have seen in the past for children who came in with accidental injuries?" Record at 297. The basis for the objection was that the Government laid an insufficient foundation for the testimony as well as that the testimony went to the "ultimate issue." *Id*. The military judge overruled the objection, and we find no abuse of discretion in that ruling.

12

GS's injuries was prejudicial, let alone sufficiently prejudicial to warrant relief under *Strickland*. The Government's evidence that GS was injured by acute, nonaccidental, blunt force trauma was simply overwhelming. Dr. Fagen explained that "nonaccidental" referred to "an abnormal force on the child or . . . a mechanism that doesn't fit with the -- appropriately with the patient's age and their capability of doing something to themselves[.]"[19] Further, she testified that the type of injury to GS's brain was "[m]ore likely" associated with "nonaccidental injuries"[20] and the result of "[s]ome type of blunt force to the left side of his face and head."[21] Dr. Amaya, an expert in the field of forensic pediatrics, testified that GS had "sustained a blunt force injury to his belly"[22] and head that were "nonaccidental."[23] Concurring that GS' injuries were caused by "nonaccidental trauma,"[24] Dr. Hebra opined that it was "[v]irtually impossible" for a child to generate enough energy to cause the types of injuries GS suffered and that it was "extremely rare and unheard of" to see a child with GS's injuries "outside of a motor vehicle setting."[25]

The defense experts reached the same conclusions. Dr. Carter testified that the cause of GS's injuries was "blunt force trauma"[26] and agreed that "nonaccidental trauma" was the most likely cause of injury.[27] Similarly, Dr. Martin, an expert in "child abuse pediatrics," testified that GS's injuries were consistent with nonaccidental trauma.[28]

Faced with unanimous expert opinion that GS's injuries were nonaccidental, defense counsel's decision to forego attempts to

---

[19] *Id.* at 384.

[20] *Id.*

[21] *Id.* at 382.

[22] *Id.* at 455.

[23] *Id.* at 464.

[24] *Id.* at 578.

[25] *Id.* at 577.

[26] *Id.* at 598.

[27] *Id.* at 599.

[28] *Id.* at 619.

13

establish otherwise was not deficient.[29]  Indeed, we conclude that efforts to utilize layperson testimony to persuade the military judge that GS's injuries were caused by preexisting medical conditions or accident prior to 23 December would certainly have failed.  For this reason, and because the court "will not second-guess the strategic or tactical decisions made at trial by defense counsel," *United States v. Mazza*, 67 M.J. 470, 475 (C.A.A.F. 2009) (internal citations and quotation marks omitted), we hold that the appellant has failed to establish that he was prejudiced by counsel's decision to decline to call witnesses to establish accidental injury or by the concession that GS's injuries were consistent with nonaccidental trauma.[30]

Finally, regarding trial defense counsel's decision to not call Mrs. Dyas to establish that others "might have had access to GS and injured him,"[31] we make three observations: (1) trial defense counsel's theory was that Mrs. Dyas had caused the injuries to GS during a time frame prior to the appellant being alone with GS;[32] (2) the appellant stated he was at work during

---

[29] In fact, trial defense counsel eventually conceded the power of the evidence, stating in closing argument that: "[GS's] injuries were concerning for nonaccidental trauma, and that's not contested, neither by the defense or the government."  *Id.* at 654.  Instead, defense counsel argued that the medical evidence indicated that GS was injured prior to the appellant taking charge of him on 23 December and therefore that Mrs. Dyas more likely than not caused GS' injuries.  *Id.* at 661.

[30] In his second assignment of error, the appellant argues that the military judge erred in denying the motion to compel the production of a woman who had custody of GS for one week immediately before GS went to live with the Dyas family and again in 2013, and that this error substantially prejudiced the appellant by "limiting his ability to rebut the voluminous medical testimony of government witnesses that [GS's] injuries appeared to be nonaccidental[.]" Appellant's Brief at 13.  Assuming *arguendo* that the military judge abused his discretion, we find no prejudice since trial defense counsel abandoned their "accidental trauma" theory during the trial.

[31] Appellant's Brief at 33.

[32] Trial defense counsel argued:

> And who we didn't hear much from, sir, is Mrs. Dyas, the witness who all of the government witnesses who examined [GS] and all of the government witnesses that interacted with her immediately questioned her credibility.  They all noted . . . that she immediately started offering explanations.  She immediately started identifying the source of some of these bruisings, explaining these bruisings as being attributable [to being] developmentally delayed.  Again, all of those providers questioned the credibility of Mrs. Dyas who was giving histories,

14

the morning of 23 December  when GS was at home with Mrs. Dyas, providing trial defense counsel a basis to reasonably argue that others had access to and injured GS; and (3) as discussed *supra*, the evidence indicating that GS was injured while in the appellant's sole care was substantial.  The experts agreed that GS's injuries were acute; Dr. Kinsman testified that there would have been no delay between injury and symptoms, and there was ample evidence that GS was asymptomatic prior to leaving for the day with the appellant.  Therefore, the impact that any additional testimony that Mrs. Dyas might have provided that "others might have had access" to GS would have been insignificant.

For these reasons, we are not persuaded that "but for" any error on counsel's part in abandoning their original theory, conceding nonaccidental trauma caused GS's injuries, or failing to call Mrs. Dyas as a witness "the result would have been different." *Quick*, 59 M.J. at 387.

## Conclusion

The findings and the sentence as approved by the convening authority are affirmed.

Senior Judge FISCHER and Judge MCDONALD concur.

For the Court

R.H. TROIDL
Clerk of Court

---

but there's no history, no explanations, given by my client.  And it's important to note who was the primary caretaker of [GS] when Staff Sergeant Dyas was on the range from sun up to sun down.

Record at 661.